[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
JUNE 29, 2005
THOMAS K. KAHN
CLERK

_____

No. 04-12914

_____

D. C. Docket No. 02-02635-CV-MHS-1

DORA ELIZABETH COOK,

Plaintiff-Appellee,

versus

GWINNETT COUNTY SCHOOL
DISTRICT,

Defendant,

J. ALVIN WILBANKS,
GRANT REPPERT,
RANDY SAMPLES,
SAM SMITH,
SHIRLEY HIXON,
CAROLYN PEALOCK,
ANDRA HALL, in their official
and individual capacities,

Defendants-Appellants.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

**(June 29, 2005)**

Before BARKETT, KRAVITCH and FARRIS[*], Circuit Judges.

KRAVITCH, Circuit Judge:

Plaintiff-appellee Dora Elizabeth Cook, a bus driver for the Gwinnett County School District ("district"), brought the instant § 1983 action against the defendants-appellants,[1] officials employed by the district, alleging violations of her First Amendment rights to free speech and free association, as well as her right to equal protection under the Fourteenth Amendment.[2] The defendants interlocutorily appeal the district court's order denying summary judgment, which determined that the defendants are not entitled to qualified immunity. Because of the interlocutory nature of this appeal, we address some preliminary matters before setting forth the facts.

## I. Scope of Review/Jurisdiction

We apply a two-step analysis to determine when an official acting within

---

[*] Honorable Jerome Farris, United States Senior Circuit Judge for the Ninth Circuit, sitting by designation.

[1] The defendants are: J. Alvin Wilbanks, superintendent; Grant Reppert, director of transportation; Randy Samples, transportation manager; Sam Smith, section manager; Shirley Hixon, zone supervisor; Carolyn Pealock, zone supervisor; and Andra Hall, zone supervisor.

[2] Cook also asserted state claims against both the district and the individual defendants. These claims are not before us on appeal. Thus, the only claims before us are federal claims against the defendants in their individual capacities.

his discretionary authority[3] is eligible for qualified immunity. Saucier v. Katz, 533

U.S. 194, 201 (2001). First, we ask whether the facts "[t]aken in the light most

favorable to the party asserting the injury,...show the officer's conduct violated a

constitutional right[.]" Id. Second, if a constitutional right was violated under the

plaintiff's version of the facts, we must then determine "whether the right was

clearly established." Id. In this interlocutory appeal, the defendants challenge both

the district court's factual findings as to whether the plaintiff put forth sufficient

evidence of an underlying constitutional violation and the district court's legal

conclusion that the law was clearly established. This forces us to briefly address

our jurisdiction over these matters.

Because a denial of summary judgment is not an appealable final judgment

under 28 U.S.C. § 1291, it is not ordinarily subject to immediate review. However,

"[a] district court's order denying a defense of qualified immunity is an appealable

final decision within the meaning of 28 U.S.C. § 1291 to the extent that it turns on

a question of law." McMillian v. Johnson, 88 F.3d 1554, 1562 (11th Cir. 1996);

see also Mitchell v. Forsyth, 472 U.S. 511, 530 (1985). When an interlocutory

appeal raises both sufficiency of the evidence and clearly established law issues, as

---

[3] It is undisputed that the defendants acted within their discretionary authority.

this appeal does, we have jurisdiction to entertain both issues.[4] Stanley v. City of

Dalton, Ga., 219 F.3d 1280, 1286 (11th Cir. 2000); Vista Community Servs. v.

Dean, 107 F.3d 840, 843-44 (11th Cir. 1997).

Although we may do so, we often decline to address the sufficiency of the

evidence issue. "In reviewing the district court's denial of summary judgment,

we–in most qualified-immunity interlocutory appeals–accept the facts which the

district court assumed for purposes of its decision about whether the law was

clearly established." Cooper v. Smith, 89 F.3d 761, 762 (11th Cir. 1996). Here,

the district court made detailed factual findings, and we choose to accept those

facts.[5] Using those facts, we therefore address only the pure legal question of

whether the defendants violated clearly established law.[6]

## II. Facts

---

[4] In this situation, we have two options: "First, we may take the facts that the district court assumed when it denied qualified immunity as a given and address only the pure legal issues in the appeal. Or, we may conduct our own analysis of the facts in the light most favorable to the plaintiff...Although we may independently review the record facts, we will not disturb a factual finding by the district court if there is any record evidence to support that finding." Stanley, 219 F.3d at 1287.

[5] Of course, we accept the district court's determination of the facts only for purposes of this interlocutory appeal. As we have stated previously in qualified immunity cases, "the 'facts', as accepted at the summary judgment stage of the proceedings, may not be the 'actual' facts of the case." Priester v. City of Riviera Beach, Fla., 208 F.3d 919, 925 n.3 (11th Cir. 2000); see also Williams v. Consolidated City of Jacksonville, 341 F.3d 1261, 1267 (11th Cir. 2003).

[6] Under the district court's findings of fact at summary judgment, we readily conclude that Cook's constitutional rights were violated. Accordingly, our analysis addresses whether those rights were clearly established. See Cooper, 89 F.3d at 763-64 (using same approach).

Since 1995, Cook has been a school bus driver for the district. Bus drivers are divided into clusters, each of which is led by a zone supervisor. Directly subordinate to each zone supervisor are team leaders, who serve in a leadership capacity over the other bus drivers. Team leaders have no authority to discipline or evaluate drivers, but they are authorized to resolve driver disputes and other issues when a supervisor is unavailable. Team leaders are not paid a higher rate than regular drivers, but they are guaranteed the opportunity to work forty hours per week, which enables them to earn more income. Regular bus drivers may have the opportunity to work forty hours per week, but these hours are not guaranteed. In 1999, Cook became a team leader.

Bus drivers have layover periods during the day when they are not transporting students to and from school or performing any other necessary work. During layovers, drivers are still on the clock, but their only duty is to wait to begin their next route. While waiting, drivers often congregate in a variety of locations, where they discuss various matters. Drivers also communicate with each other through a monthly newsletter called "The Transportation News" published by the transportation department; by posting solicitations in work areas; and by distributing fliers in driver paycheck envelopes.

Although it is unclear whether the district has a formal policy restricting

speech during working hours, in practice, the district permitted a variety of solicitations during working hours. While on the clock, employees freely solicited contributions for sympathy gifts, Christmas gifts, Relay for Life, the United Way, and a disaster relief fund. In addition, while on the clock, employees bought and sold various items including candy, T-shirts, Girl Scout cookies, church products, key chains, washcloths, and miniature school buses. The defendants engaged in some of these activities while on the clock as well: Pealock participated in the sale of cosmetics; Hixon purchased cookies and church fund raiser products; Reppert purchased an American eagle replica and encouraged employees to form a transportation department Weight Watchers group; and Hall bought T-shirts and donated money for Christmas gifts. In addition, Reppert devoted substantial work time to the expression of his personal views on political matters in columns he prepared for "The Transportation News."

Since 2001, Cook has been a member of the United School Employees Association ("USEA"), a union-like[7] organization which represents non-teaching school employees and is affiliated with the Georgia Association of Educators. She was elected co-president of the USEA in March 2001 and president in 2002. The

_____

[7] Although both parties refer to the USEA as a union, it is not a union as that term is normally understood because it cannot engage in collective bargaining with the district. See O.C.G.A. § 20-2-989.10.

USEA states that its first priority is the safety of children in school and the union believes that well-trained, motivated, and content employees are one of the keys to school safety. The USEA also assists its members with matters pertaining to dismissal, grievances, wages, benefits, and other conditions of employment. Moreover, the USEA lobbies the state legislature regarding safety conditions and other issues of concern to bus drivers and students, and provides legal counsel to members in the event of a civil lawsuit arising from their employment.

During layovers when she had no duties to complete, Cook recruited fellow employees to join the USEA. She also raised various safety concerns and other matters to supervisors on behalf of her fellow bus drivers. Under her leadership, USEA membership increased 235%. Defendants Hall and Hixon ordered Cook to stop discussing USEA during working hours. The defendants also refused to allow Cook to insert a flyer for a USEA sponsored food drive in employee's paycheck envelopes unless all references to USEA were removed. The parties dispute whether the defendants took such action because they needed to maintain discipline and efficiency in the workplace or whether it was motivated by animus towards Cook's USEA activities and speech.

In May 2002, plaintiff's supervisor, Hall, requested that Cook be transferred

7

to another cluster.[8] Due to the transfer, Cook no longer holds the position of team leader. According to the defendants, Hall sought to transfer Cook because he did not trust her and felt that she was insubordinate. By contrast, Cook contends that she and Hall had a good working relationship before she began conducting USEA activities and she was transferred in retaliation for her USEA activities and speech.

Although the district has a policy requiring documentation of personnel infractions, Cook's employment record contains no documentation of any insubordination, disruption, or lack of trustworthiness. In addition, she never received a poor evaluation. Cook submitted other evidence of hostility toward the USEA such as testimony from Hixon that she is "against union...[W]e don't...need a union, period,"; testimony from several employees that Hall made a number of anti-USEA comments to employees; testimony that Hall told Cook that her USEA position was inconsistent with her team leader status; and Reppert's column in "The Transportation News" in which he called USEA concerns "bovine scatology."

### III. Discussion

A. Standard of Review

We review de novo a district court's holding that public officials are not

---

[8] Defendant Reppert made the decision to transfer Cook.

entitled to qualified immunity because they violated clearly established law. Johnson v. Clifton, 74 F.3d 1087, 1090 (11th Cir. 1996).

B. Analysis

*Adverse Employment Action*

As a preliminary matter, the defendants argue that Cook's First Amendment claims are not cognizable because she suffered no adverse employment action. In particular, the defendants contend that the May 2002 transfer was purely lateral because her rate of pay remained the same. This argument has no merit. Although Cook's rate of pay remained the same after the transfer, she could no longer serve as a team leader, a position which had guaranteed her forty hours of work per week. Thus, due to the transfer, Cook lost the guarantee to earn the same amount of money she previously enjoyed as a team leader. See McCabe v. Sharrett, 12 F.3d 1558 (11th Cir. 1994) (holding transfer was adverse employment action even though salary did not decrease, where eligibility for salary increases was less); see also Eskra v. Provident Life & Accident Ins. Co., 125 F.3d 1406, 1411 (11th Cir. 1997). In addition, she lost the additional prestige and office responsibilities that came with being a team leader. See Hinson v. Clinch County, Georgia Bd. of Educ., 231 F.3d 821, 829-30 (11th Cir. 2000) (explaining that transfer can be adverse if it involves loss of prestige and responsibility). Thus, we conclude that

9

Cook suffered an adverse employment action.

Next, we turn to the question of whether the defendants violated clearly established law.

*Free Speech Claim*

The law is clearly established that a public employer may not retaliate against an employee for an employee's exercise of constitutionally protected speech. Rankin v. McPherson, 483 U.S. 378, 383 (1987); Connick v. Myers, 461 U.S. 138, 140-42 (1983). Of course, a public employee does not have an absolute right to freedom of speech and the "State's interest as an employer in regulating the speech of its employees differ[s] significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Connick, 461 U.S. at 140 (quotation marks omitted). To strike the appropriate balance between the respective interests, we apply the four-step analysis set forth in Pickering v. Board of Education, 391 U.S. 563 (1968) and Bryson v. City of Waycross, 888 F.2d 1562 (11th Cir. 1989).

To prevail under this analysis, an employee must show that: (1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer's interest in effective and efficient fulfillment of its responsibilities; and (3) the speech played a substantial part in the adverse

10

employment action. Bryson, 888 F.2d at 1565-66. If an employee satisfies her burden on the first three steps, the burden then shifts to the employer to show by a preponderance of the evidence that it would have made the same decision even in the absence of the protected speech. Id. The first two steps are questions of law; the final two steps are "questions of fact designed to determine whether the alleged adverse employment action was in retaliation for the protected speech." Anderson v. Burke County, Ga., 239 F.3d 1216, 1219-20 (11th Cir. 2001). Because the district court found that jury questions were created with respect to the cause of Cook's transfer, and we accept those findings (see Part I), we address only steps (1) and (2), which are questions of law.

First, we consider the threshold question of whether Cook's speech involved a matter of public concern. A public employee's speech involves a matter of public concern if it can "be fairly considered as relating to any matter of political, social, or other concern to the community." Connick, 461 U.S. at 146. To make this determination, we consider the "content, form, and context" of the speech. Rankin, 483 U.S. at 384-85.

The defendants maintain that Cook's speech did not involve a matter of public concern because it concerned only internal bus driver employment issues and other matters pertaining only to Cook's personal interests. We disagree. As

11

president of the USEA, Cook spoke on behalf of an organization that, *inter alia*, seeks to improve the safety of children in school and believes that well-trained and motivated employees are one of the keys to school safety. The mere fact that her speech was made to coworkers or to supervisors rather than directed at the general public does not remove the speech from the category of public concern. Givhan v. Western Line Consol. School Dist., 439 U.S. 410, 415-16 (1979); Peterson v. Atlanta Housing Authority, 998 F.2d 904, 916 (11th Cir. 1993).

Specifically, Cook expressed her concerns about the safety of children due to bus overcrowding and the lack of time allotted for pre-trip bus inspections. In various contexts, we have made it clear that speech relating to the safety of the public involves a matter of public concern. Anderson, 239 F.3d at 1220; Finch v. City of Vernon, 877 F.2d 1497, 1502 (11th Cir. 1989). Thus, there can be no question that Cook's speech regarding safety concerns in the largest school district in Georgia involves a matter of public concern. See Swilley v. Alexander, 629 F.2d 1018, 1021 (5th Cir. 1980)[9] (speech relating to physical safety and well-being of school children was matter of public concern).

There is another public concern aspect of Cook's speech which provides her

---

[9] In Bonner v. City of Pritchard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this Court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to close of business on September 30, 1981.

12

a second layer of protection. Without disrupting the workplace or neglecting any specific job duties, Cook recruited her fellow employees to join the USEA. She did so to improve a variety of conditions, not only for herself individually, but rather for the collective welfare of her fellow drivers. To this end, she went to the state capitol to engage in lobbying on behalf of bus drivers and took photographs with USEA members to help promote the lobbying effort. Issues regarding the operation of government, including issues of union organization, are often considered matters of public concern. Cf. Thornhill v. Alabama, 310 U.S. 88, 104 (1940); see also Porter v. Califano, 592 F.2d 770, 779 (5th Cir. 1979) (speech regarding termination of top union leader was matter of public concern). Indeed, this court recognized, in the context of advocacy by members of the Georgia Association of Educators involving the very same school district at issue in this case, that "[t]he First Amendment protects the right of public employees to associate, speak, and petition freely...[and] [t]he Government may not retaliate against individuals or associations for their exercise of First Amendment rights by imposing sanctions for the expression of particular views it opposes." Georgia Ass'n of Educators v. Gwinnett County Sch. Dist., 856 F.2d 142, 145 (11th Cir. 1988) (quotation marks omitted).

Thus, for all of these reasons, we hold that Cook's speech involved a matter

of public concern. The district court was correct in concluding that "[p]laintiff's speech about the competency, organization, and management of school bus drivers in the state's largest school district is certainly of public interest."

We next apply a balancing test to determine if Cook's free speech interests outweighed the interests of the state. Rankin, 483 U.S. at 388. The defendants argue that they restricted Cook's speech only to the extent necessary to maintain efficiency in the workplace. The district court found, however, that Cook did not engage in any USEA-related speech while transporting children or performing her other job duties. Notably, despite the fact that the district had a policy of recording issues of misconduct, Cook's personnel file contained no incidents of misconduct and no record of a poor evaluation. In addition, the defendants were unable to point to any specific job duties that Cook neglected as a result of her USEA speech. The defendants' efficiency argument is further undercut by the fact that they freely permitted and even participated in a variety of solicitations during working hours.

Thus, under the facts as found by the district court at summary judgment, Cook's interests in promoting safety and improving the competency, management, and organization of district bus drivers far outweighed the scant evidence that the district proffered in support of its workplace efficiency argument. We therefore

conclude that the <u>Pickering</u> balance tilted conclusively in favor of Cook such that the defendants had fair and clear warning that their actions were unconstitutional. See <u>Cooper</u>, 89 F.3d at 764-65; <u>Stewart v. Baldwin County Board of Education</u>, 908 F.2d 1499, 1506 (11th Cir. 1990).

Moreover, after <u>Hope v. Pelzer</u>, 536 U.S. 730 (2002), we have emphasized that "general statements of the law are perfectly capable of giving clear and fair warning to officers even where the very action in question has [not] previously been held unlawful." <u>Harris v. Coweta County, Ga.</u>, 406 F.3d 1307, 1318 (11th Cir. 2005) (quotation marks omitted); <u>see also</u> <u>Holloman v. Harland</u>, 370 F.3d 1252, 1277-79 (11th Cir. 2004) (explaining same).

*Free Association Claim*

The plaintiff also argues that the defendants violated her right to free association under the First Amendment by retaliating against her for her associational activity with USEA. Cook's associational activities included discussing USEA issues with other drivers and recruiting other USEA members in a non-disruptive manner. As with her free speech claim, the law is clearly established that public employees have a First Amendment right to engage in associative activity without retaliation. <u>Hatcher v. Board of Pub. Educ. & Orphanage for Bibb County</u>, 809 F.2d 1546, 1558 (11th Cir. 1987); <u>see also</u> <u>Smith</u>

15

v. Arkansas State Highway Employees Local 1315, 441 U.S. 463, 465 (1979). Furthermore, courts have long held that freedom of association protection extends to membership in organizations such as labor unions. See Thomas v. Collins, 323 U.S. 516 (1945).

In analyzing free association claims in this context, we do not apply the public concern portion of the Pickering analysis. Hatcher, 809 F.2d at 1558. We do, however, apply the Pickering balancing test. See Ross v. Clayton County, 173 F.3d 1305, 1310 (11th Cir. 1999). Accordingly, for the same reasons we explained in the free speech discussion, under these facts, Cook's interest in associating with the USEA far outweighed any countervailing state interest. Thus, the district court was correct to conclude that the defendants were not entitled to qualified immunity on Cook's free association claim.

*Equal Protection Claim*

Finally, we address the plaintiff's claim that the defendants violated her right to equal protection by restricting her USEA-related speech, while at the same time permitting many others forms of speech. In particular, Cook alleges that the defendants would not allow her to distribute a flyer promoting a food drive in employee paycheck envelopes unless she first removed all references to USEA, whereas they did not restrict various other forms of commercial, political, and

16

personal speech which did not involve the USEA.

When the government selectively excludes speakers from a forum, Equal Protection interests as well as First Amendment interests may be implicated. See Police Department of City of Chicago v. Mosley, 408 U.S. 92, 101-02 (1972). The defendants argue that the school, its internal mail system, and the employee paycheck envelopes are non-public forums. They are correct. But even in a non-public forum, the law is clearly established that the state cannot engage in viewpoint discrimination–that is, the government cannot discriminate in access to the forum on the basis of the government's opposition to the speaker's viewpoint. Perry Educ. Ass'n. v. Perry Local Educators' Ass'n., 460 U.S. 37, 45 (1983); see also Chandler v. Georgia Public Telecommunications Com'n, 917 F.2d 486, 491 (11th Cir. 1990). As the Supreme Court explained in Perry:

> In addition to time, place, and manner regulations, the state may reserve the forum for its intended purposes, communicative or otherwise, as long as the regulation on speech is reasonable and *not an effort to suppress expression merely because public officials oppose the speaker's view.*

460 U.S. at 45 (emphasis added). Thus, accepting the district court's findings that Cook proffered sufficient evidence that the defendants selectively excluded her USEA-related speech because of its viewpoint, Perry gave the defendants fair and clear warning that their actions violated clearly established law. Accordingly, the

district court was correct to conclude that the defendants are not entitled to qualified immunity on Cook's equal protection claim.

For the foregoing reasons, we AFFIRM.

**AFFIRMED.**