WILSON, Circuit Judge:
On this appeal, we consider whether a written grievance by five university employees alleging mismanagement by their supervisor which preceded -their termination is entitled to First Amendment protection. Appellants Melissa A. Alves, Corey M. Arranz, Sandrine M. Bosshardt, Kensa K. Gunter, and Alaycia D. Reid (collectively, Appellants) are clinical psychologists and former full-time staff employees at the Georgia State University (the University) Counseling and Testing Center (the Center). In 2012, they were terminated through a purported reduction-in-force by Dr. Jill Lee-Barber, the Director of the Center, and Dr. Douglass F. Covey, the Vice President of Student Affairs. According to Appellants, the reduction in force was mere pretext. They were terminated, they say, in retaliation for submitting a Memorandum to University officials complaining about what they perceived to be poor leadership and mismanagement by Dr. Lee-Barber. Appellants say their Memorandum amounts to citizen speech on a matter of public concern, which would be protected by the First Amendment, and that their retaliatory termination thus violated the Constitution. The district court found, however, that the Appellants’ Memorandum' constituted employee speech on an issue related to their professional duties, which would not be subject to First Amendment protection, and granted summary judgment to Appellees on that ground. We affirm the judgment.
*1154 I.
In August 2009, the University hired Dr. Lee-Barber as its Director of Psychological and Health Services. Dr. Lee-Barber was tasked with administrative and supervisory responsibility over three departments: the student health clinic, student health promotion, and the Center.
A. The Center
The Center provided clinical services to the student body, including psychological counseling, testing, and assessment, and operated a training program for doctoral students, which included pre-doctoral internships, a praeticum training program for doctoral students, and post-doctoral fellowships.
The mental health services provided by staff at the Center included, among other things, initial consultations, individual and couples counseling, group counseling, nutrition consultations, mental health outreach, and faculty and staff consultations. As of 2011, upward of fifty percent of the Center’s clinical services were provided by trainees in the Center’s training program. Candidates for the Center’s training program were recruited through national “feeder programs” managed by the Center’s staff.
The Center was also tasked with conducting mandatory psychological assessments of students who were identified by the Office of the Dean of Students as individuals who had the potential to cause harm to themselves or to others. The assessments were performed through the University’s Mandated Safety Assessment Program, which was administered by certain staff at the Center. A student deemed a “safety concern” by the Office of the Dean of Students was referred by the Office of the Dean of Students to the Center for evaluation through the Program. Students identified as “safety concerns” might be excluded from on-campus housing or continued enrollment at the University. The Director of the Center was tasked with coordinating assessment efforts with the Office of the Dean of Students.
B. The Staff
Dr. Lee-Barber assumed her role as Director of the Center in 2009. In that capacity, Dr. Lee-Barber oversaw the Center’s programs, managed the Center’s operations, and served as the liaison between the Center and the Office of the Dean of Students with regard to the Mandated Safety Assessment Program. Dr. Lee-Barber reported to Dr. Rebecca Stout, Associate Vice President for Student Affairs and Dean of Students, who, in turn, reported to Dr. Douglass Covey, Vice President of Student Affairs.
When Dr. Lee-Barber assumed her role as Director, Appellants were employed as full-time staff and clinical psychologists at the Center. Appellants’ responsibilities at the Center were expansive and varied, and, given the nature of Appellants’ retaliation claim, a brief summary of each of Appellants’ roles is in order.
Dr. Arranz was the Crisis Response Coordinator for and a clinical psychologist at the Center. He helped develop the University’s Mandated Safety Assessment Program and formulate the procedures used in assessing a student’s risk of violence through the Program. Among other things, Dr. Arranz oversaw the Center’s crisis services, provided training on crisis procedures to staff and trainees, supervised interns, students, and trainees, and conducted mandated assessments.
Dr. Reid was the Assistant Director of Training and a clinical psychologist at the Center. Her duties included, among other things, providing clinical services, assisting *1155 in the coordination of clinical services, supervising senior staff psychologists and trainees, serving as the Associate Director on Duty when the Director of the Center was unavailable, serving as a consultant to the Office of the Dean of Students, assisting in the development of policies and procedures for the Center, and conducting mandated assessments. Dr. Reid also served as an adjunct professor at the University.
Dr. Bosshardt was the Coordinator of Mind-Body Programs and a clinical psychologist at the Center. She was the Center’s liaison to the International Student Services and the University Health Clinic. Dr. Bosshardt also performed the general duties of a staff psychologist, which included individual and group therapy, outreach services, individual supervision for trainees, and weekly crisis walk-in hours. She also served as a member of the Center’s Clinical Task Force and Executive Training Committee.
Dr. Alves served as the Center’s Internship Training Director and was a clinical psychologist at the Center. In addition to providing general clinical services to the University community, Dr. Alves also provided “educational instruction” to trainees, supervised interns, post-doctoral students, and practicum students, and served on numerous committees, including the Center’s Executive Committee (an “upper administrative level” committee).
Dr. Gunter, the fifth and final Appellant, joined the Center as the Outreach Coordinator before transitioning to Coordinator of Practicum Training. In the latter role, Dr. Gunter served as the primary point of contact for practicum students. She was also the Center’s liaison to the University’s Athletic Department, the primary provider of sports psychology and counseling services, and, as of 2010, Chair of the Center’s Diversity Committee and Co-Chair of the Cultural Competency Conference Planning Committee.
The Center’s staff also included several professionals and trainees who are not parties to this appeal, including clinical psychologist Dr. Rachel Kieran, the Center’s sexual and gender diversity coordinator; Dr. Pegah Moghaddam, a senior staff psychologist and the Center’s group therapy coordinator; and clinical psychologist Dr. Yared Alemu, who served as the interim Assistant Director of Clinical Services and on the Center’s mandatory assessment team with Drs. Reid and Arranz.
C. The Speech
On or about October 18, 2011, Dr. Gun-ter met with the University’s Office of Opportunity Development and Diversity Education Planning (ODDEP). The OD-DEP deals with issues of discrimination within the University community. In the meeting, Dr. Gunter expressed concerns regarding Dr. Lee-Barber’s management of the Center and an interest in filing a complaint against Dr. Lee-Barber. An intake form completed by Dr. Gunter listed the bases for her complaint as race and age unfairness, “potential hostile work environment,” and “retaliation for stating that [Dr. Lee-Barber’s] behavior was hypocritical.” Other “not discrimination based” issues included personnel issues, increasing office conflict, and unfair treatment. Dr. Gunter ultimately did not file a complaint.
On October 25, 2011, Appellants and two other full-time psychologists, Drs. Mo-ghaddam and Alemu, submitted a formal, written memorandum of concern to University officials regarding Dr. Lee-Barber’s management of the Center (the *1156 Memorandum).[1] The Memorandum was addressed to Drs. Covey and Stout — Dr. Lee-Barber’s immediate supervisors — and was copied to the Senior Vice President for Academic Affairs and Provost, the University Attorney in the Office of Legal Affairs, and Dr. Lee-Barber.
In the Memorandum, Appellants alleged that Dr. Lee-Barber’s leadership and management of the Center adversely impacted client care and jeopardized the reputation of the Center. They complained that Dr. Lee-Barber had created an unstable work environment that prevented staff from “effectively carry[ing] out all aspects of their work” and from “optimally performing] daily required tasks[,] including the ability to collaboratively manage risk.” Appellants expressly stated that the Memorandum was “not an employee grievance,” but rather “a documentation of identifiable behaviors ... that jeopardize^] the programs” offered by the Center. The Memorandum then set forth five areas of general concern:
1.Deficiencies in Managing Center Operations: Appellants alleged that Dr. Lee-Barber demonstrated “a fundamental misunderstanding” of the Center’s client population and “deficiencies in her ideological approach to” the services provided by the Center. They further contended that Dr. Lee-Barber lacked “knowledge in the areas of complex psychopathology,” was ineffective “in dealing with campus collaborators,” and had an “inability to advocate for the appropriate use of psychologists’ skills in conducting [the mandated safety risk] assessments,” which “significantly compromise^] the [Center’s] ability to effectively manage risk and crisis.” Appellants claimed that Dr. Lee-Barber’s “lack of assessment skills” posed “problems in recognizing risk” and that her “lack of understanding about the nuances of the mandated program ... contributed to her misinforming staff about when and how to use the mandated process.”
2. Failure to Maintain Positive Trainee Relationships: Appellants alleged that the Center’s “quality relationships” with feeder programs and its overall reputation were critical to its “ability to attract, recruit, and retain trainees.” They claimed that Dr. Lee-Barber’s “management style” had created “rifts” in the Center’s relationships with its feeder programs and that the Associate Director of Training [Dr. Reid] had to “step in and manage the damage.” They also relayed “concerns” voiced by trainees regarding Dr. Lee-Barber’s “communication style,” “lack of authenticity,” and “apparent confusion” about “some policies and procedure,” her “inappropriate comments” about the physical attractiveness of one trainee, and other “negative nonverbal” behavior such as “eye-rolling.”
3. Questionable Competence in Management of Center Resources: Appellants alleged that “Dr. Lee-Barber’s management of personnel, which is the primary clinical resource of the Center, [had] been a significant problem.” They questioned “Dr. Lee-Barber’s emotional and professional stability” given her “pervasive pattern” of “significant” emotional outbursts. Dr. Lee-Barber allegedly failed to adhere “to the boundaries of the professional rela *1157 tionship” in one-on-one meetings with staff members wherein she would “discuss her feelings” about other employees. Appellants catalogued Dr. Lee-Barber’s difficulty in considering feedback from others and staunch maintenance of a “singular vision” for the Center. They also complained that Dr. Lee-Barber had a “preoccupation” with staff members taking notes during staff meetings and that Dr. Lee-Barber’s management style “undermine[d] open communication.”
4. Witness Tampering and Influence: Appellants alleged that Dr. Lee-Barber sought to influence the testimony of at least three staff members who were witnesses in a tenure revocation proceeding involving the former Associate Clinical Director of the Center by “encouraging” the three staff members to only provide information that “could support the University’s position.” She allegedly told one staff member, “We need to support the President [of the University],” and she “exhibited frustration” in discussing the proceedings with another. Appellants postulated that Dr. Lee-Barber was “misusing” her “authority and power in encouraging a certain level of participation” in the revocation proceedings.
5. Differential Treatment of Staff of Color: Appellants also alleged that Dr. Lee-Barber responded differently to “staff of color” than to “white-identified staff.” They stated that Dr. Lee-Barber would complain when “staff of color” used portable electronic devices to take notes in staff meetings, but she did not complain when “white-identified staff’ did the same. They further alleged that Dr. Lee-Barber “routinely commented” on the tone of voice and body language of “staff of color,” but she did not make the same comments to “white-identified staff.”
Appellants asserted that, in addition to raising awareness, about their concerns, the Memorandum served “as a request for an investigation of [Appellants’] concerns in order to remedy the ... crisis in leadership and management” at the Center. To this end, Appellants directed the Memorandum “to those that would appear to have the most need to know and best opportunity to investigate and correct the problems [they had] observed.”
D. The University’s Response
Dr. Covey appointed two senior staff members, Carol Clark, Assistant Vice President for Student Affairs, and William Walker, Director of Student Affairs, to investigate Appellants’ concerns. Between November and December 2011, Clark and Walker interviewed each of the Appellants. Clark and Walker also asked each Appellant to submit an individual statement detailing the specific complaints in the Memorandum of which he or she had personal knowledge.[2]
In January 2012, Dr. Covey met with Appellants to inform them that Clark and Walker had found insufficient evidence to *1158 substantiate their concerns. Copies of a final investigative report prepared by-Clark and Walker were forwarded to Appellants on February 3, 2012. The report stated that Appellants’ “negative attitudes and dissatisfaction seem[ed] to be due to the desire of some of the staff to run the Center in the collaborative clinical services model that was used by the former director.” Clark and Walker also reported a “strong resistance” to change and a “reluctance to follow directions” among the Center’s staff. In the end, Dr. Covey determined that no action would be taken against Dr. Lee-Barber.
Within a week after the final report was issued to Appellants, Dr. Lee-Barber made the unilateral decision to cancel the Center’s practicum training program and the Center’s participation in the national matching program for interns. Dr. Lee-Barber asserted that the changes were due to an accreditation standard that recommended that no more than forty percent of the Center’s clientele be seen by trainees. The cancellations eliminated many of the job duties of Drs. Reid, Gunter, and Alves.
In the days between February 10 and March 2, Drs. Lee-Barber and Covey, with assistance from other University officials, also made the decision to implement a reduction in force that would eliminate the entire staff of full-time psychologists— all but one of whom were signatories to the Memorandum. University officials intended to outsource the clinical services provided at the Center to contract psychologists to allegedly lower the costs associated with running the Center. On March 2, 2012, Appellants (along with a full-time psychologist who was not a signatory to the Memorandum) were terminated.
E. The District Court Proceedings
On April 20, 2012, Appellants filed a complaint in state court against Dr. Lee-Barber, Dr. Covey, and the Board of Regents of the University System of Georgia (collectively, Appellees). The action was removed to federal court. Appellants’ complaint asserted four counts, including a claim under 42 U.S.C. § 1983 for retaliation in violation of the First Amendment of the United States Constitution and a claim for the same under the Georgia State Constitution. After discovery, Appellees moved for summary judgment on all claims. The district court granted Appel-lees’ motion as to Appellants’ free speech claims and denied it with leave to renew as to Appellants’ other claims.
The district court held that Appellants’ speech was not protected speech because Appellants spoke as employees on private matters rather than as citizens on matters of public concern. The court rejected Appellants’ characterization of the Memorandum as limited in scope to the Center’s management of risk and crisis, reasoning that “[t]he fact that one issue raised in the [Memorandum] — mandatory risk assessments — might reflect on public safety or public policy is not sufficient to bring the entire [Memorandum] within the ambit of ‘public concern,’ particularly given the fact that the remainder of the Memorandum addressed employment issues.” It found that Appellants’ complaints addressed the manner in which Dr. Lee-Barber’s management style affected Appellants as employees, not how her management of the Center impacted public health and safety. In the absence of constitutional protection, the district court granted summary judgment' to Appellees on Appellants’ free speech claims.
Appellants timely filed this instant appeal.[3]
*1159 II.
We review an order granting summary judgment de novo, applying the same legal standards that bound the district court. Hegel v. First Liberty Ins. Corp., 778 F.3d 1214, 1219 (11th Cir.2015). As such, we will not affirm a grant of summary judgment unless the movant has shown that “there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.” Id. (internal quotation marks omitted). In our review, “[a]ll evidence must be viewed in the light most favorable to the party opposing the motion for summary judgment.” Ave. CLO Fund, Ltd. v. Bank of Am., N.A., 723 F.3d 1287, 1294 (11th Cir.2013) (internal quotations marks omitted). We do not weigh conflicting evidence or make credibility determinations, and we draw “[a]ll reasonable inferences arising from the undisputed facts ... in favor of the nonmovant.” Id. (internal quotation marks omitted).
III.
 A government employer may not demote or discharge a public employee in retaliation for speech protected by the First Amendment. Bryson v. City of Waycross, 888 F.2d 1562, 1565 (11th Cir.1989). While a citizen who enters public service “must accept certain limitations on [her] freedom[s],” Garcetti v. Ceballos, 547 U.S. 410, 418, 126 S.Ct. 1951, 1958, 164 L.Ed.2d 689 (2006), she does not “relinquish the First Amendment rights [she] would otherwise enjoy as [a citizen] to comment on matters of public interest,” Pickering v. Bd. of Educ., 391 U.S. 563, 568, 88 S.Ct. 1731, 1734, 20 L.Ed.2d 811 (1968). Thus, the aim is to strike “a balance between the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees.” Id. at 568, 88 S.Ct. at 1734-35.
A.
The Supreme Court sets forth a two-step inquiry into whether the speech of a public employee is constitutionally protected:
The first requires determining whether the employee spoke as a citizen on a matter of public concern. If the answer is no, the employee has no First Amendment cause of action based on ... her employer’s reaction to the speech. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public [based on the government’s interests as an employer].
Garcetti, 547 U.S. at 418, 126 S.Ct. at 1958 (citations omitted) (identifying, from Pickering and its progeny, “two inquiries to guide interpretation of the constitutional protections accorded to public employee speech”). Both steps are questions of law for the court to resolve. See, e.g., Moss v. City of Pembroke Pines, 782 F.3d 613, 618 (11th Cir.2015); Battle v. Bd. of Regents, 468 F.3d 755, 760 (11th Cir.2006) (per curiam). This appeal turns on the first step: “whether the employee[s] spoke as ... citizenfs] on a matter of public concern.”[4] Garcetti 547 U.S. at 418, 126 S.Ct. at 1958.
*1160 This threshold inquiry is comprised of two requirements. For her speech to be constitutionally protected, an employee must have spoken (1) as a citizen and (2) on a matter of public concern. See, e.g., Boyce, 510 F.3d at 1342. Garcetti’s “threshold layer” looks at both the “role the.speaker occupied” and “the content of the speech” to determine whether the government retaliation at issue warrants the Pickering analysis. See Davis v. McKinney, 518 F.3d 304, 312 (5th Cir.2008) (internal quotation marks omitted); see also Garcetti 547 U.S. at 417, 126 S.Ct. at 1957 (“[T]he First Amendment protects a public employee’s right, in certain circumstances, to speak as a citizen addressing matters of public concern.”).
Under Garcetti and its progeny, a court must consider the balance of public and private interests articulated in Pickering only when the employee speaks “as a citizen.” See Boyce, 510 F.3d at 1342-43; Vila, 484 F.3d at 1339; see also Garcetti, 547 U.S. at 423, 126 S.Ct. at 1961. If the employee spoke as a citizen and on a matter of public concern, “the possibility of a First Amendment claim arises,” and the inquiry becomes one of balance, see Garcetti, 547 U.S. at 418, 126 S.Ct. at 1958; on the other hand, if the employee spoke as an employee and on matters of personal interest, the First Amendment is not im-
plicated, and “the constitutional inquiry ends with no consideration of the Pickering test,” see Boyce, 510 F.3d at 1343. The First Amendment will step in to safeguard a public employee’s right, as a citizen, to participate in discussions involving public affairs, but “it [will] not empower [her] to ‘constitutionalize the employee grievance.’ ” Garcetti 547 U.S. at 420, 126 S.Ct. at 1959 (quoting Connick v. Myers, 461 U.S. 138, 154, 103 S.Ct. 1684, 1694, 75 L.Ed.2d 708 (1983)).
B.
As to the “citizen” requirement, the Supreme Court has held that “when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.” Id. at 421, 126 S.Ct. at 1960. In Garcetti the Court found that an internal memorandum written by a deputy district attorney “pursuant to his duties” did not constitute speech as a citizen and was thus unprotected. Id.
Because the attorney in Garcetti conceded that his written statements were made “pursuant to his employment duties,” the Court “ha[d] no occasion to articulate a comprehensive framework” for *1161 determining just what the Court meant by the phrase “pursuant to his employment duties.” See id. at 424, 126 S.Ct. at 1961. Given the circumstances, the Court observed:
The proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually, is expected to perform, and the listing of a given task in an employee’s written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee’s professional duties for First Amendment purposes.
Id. at 424-25, 126 S.Ct. at 1961-62.
Under Garcetti “[t]he central inquiry is whether the speech at issue ‘owes its existence’ to the employee’s professional responsibilities.” Moss, 782 F.3d at 618 (quoting Garcetti, 547 U.S. at 421, 126 S.Ct. at 1960); see Abdur-Rahman v. Walker, 567 F.3d 1278, 1283 (11th Cir.2009); Boyce, 510 F.3d at 1342. Practical factors that may be relevant to, but are not dispositive of, the inquiry include the employee’s job description, whether the speech occurred at the workplace, and whether the speech concerned the subject matter of the employee’s job. See Moss, 782 F.3d at 618. As Garcetti instructed, the “controlling factor” is whether the employee’s statements or expressions were made “pursuant to [her] official duties.” Garcetti, 547 U.S. at 421, 126 S.Ct. at 1959-60.
The Supreme Court recently revisited Garcetti in Lane v. Franks, 573 U.S.-, 134 S.Ct. 2369, 189 L.Ed.2d 312 (2014). In Lane, the Court found that “[t]ruthful testimony under oath by a public employee outside the scope of his ordinary job duties is speech as a citizen for First Amendment purposes.” Lane, 134 S.Ct. at 2378. The Court noted that the subpoenaed testimony at issue in Lane was “far removed from the speech at issue in Garcetti.” Id. at 2379. The communication in Lane was separate and apart from the employee’s obligations to his employer, see id., while the memorandum in Garcetti was commissioned by the employer, Garcetti, 547 U.S. at 422, 126 S.Ct. at 1960. The fact that Lane “learned of the subject matter of his testimony in the course of his employment” could not alone transform his “sworn testimony speech as a citizen” into employee speech on par with Garcetti’s employer-commissioned speech. See Lane, 134 S.Ct. at 2379 (“[T]he mere fact that a citizen’s speech concerns information acquired by virtue of his public employment does not transform that speech into employee ... speech.”).
The Court noted that, in finding that the employee’s memorandum was “made pursuant to [his] official responsibilities” in Garcetti the Court “said nothing about speech that simply relates to public employment or concerns information learned in the course of public employment.” Lane, 134 S.Ct. at 2379 (internal quotation marks omitted). Indeed, in Garcetti the Court “made explicit that its holding did not turn on the faet that the memo at issue concerned the subject matter of the prosecutor’s employment, because the First Amendment protects some expressions related to the speaker’s job.” Id. (internal quotation marks omitted). Thus, in Lane, the 'Court reiterated that “[t]he critical question under Garcetti is whether the speech at issue is itself ordinarily within the scope of an employee’s duties, not whether it merely concerns those duties.” Id. (emphasis added); see Garcetti, 547 U.S. at 421-22, 126 S.Ct. at 1960 (defining speech made pursuant to an employee’s job duties as “speech that owes its existence to a public employee’s professional responsibilities” and speech the “employer itself has commissioned or created”).
*1162 After Lane, the exception to First Amendment protection in Garcetti for “speech that owes its existence to a public employee’s professional responsibilities,” Garcetti, 547 U.S. at 421-22, 126 S.Ct. at 1960, must be read narrowly to encompass speech that an employee made in accordance with or in furtherance of the ordinary responsibilities of her employment, not merely speech that concerns the ordinary responsibilities of her employment.
C.
The second requirement—that the speech address a matter of public concern—concerns the context of the speech and asks whether the employee spoke on a matter of public concern or on matters of only personal interest. See, e.g., Boyce, 510 F.3d at 1342-43. To fall within the realm of “public concern,” an employee’s speech must relate to “any matter of political, social, or other concern to the community.” Connick, 461 U.S. at 146, 103 S.Ct. at 1690; see Snyder v. Phelps, 562 U.S. 443, 453, 131 S.Ct. 1207, 1216, 179 L.Ed.2d 172 (2011) (including within the ambit of “public concern” speech that “is a subject of legitimate news interest ... [or] a subject of general interest and of value and concern to the public” (internal quotation marks omitted)). The inquiry turns on “the content, form, and context of a given statement, as revealed by the whole record.” Connick, 461 U.S. at 147-48, 103 S.Ct. at 1690.
In determining whether the purpose of the employee’s speech was to raise issues of public concern or to further her own private interest, we have recognized that “an employee’s speech will rarely be entirely private or entirely public.” E.g., Akins v. Fulton Cty., 420 F.3d 1293, 1304 (11th Cir.2005) (internal quotation marks omitted). Therefore, in reviewing the whole record, “[w]e ask whether the main thrust of the speech in question is essentially public in nature or private.” Vila, 484 F.3d at 1340 (internal quotation marks omitted); see Morgan v. Ford, 6 F.3d 750, 755 (11th Cir.1993) (per curiam) (“Rather than categorize each phrase the employee uttered, we consider whether the speech at issue was made primarily in the employee’s role as citizen, or primarily in the role of employee.” (internal quotation marks omitted)). If the “main thrust” of a public employee’s speech is on a matter of public concern, the speech is protected. See Morgan, 6 F.3d at 754-55.
A court may also consider the employee’s attempt to make her concerns public along with the employee’s motivation in speaking. See id. at 754; Vila, 484 F.3d at 1339. However, “a court cannot determine that an utterance is not a matter of public concern solely because the employee does not air the concerns to the public.”. See Morgan, 6 F.3d at 754 n. 5; see also Kurtz v. Vickrey, 855 F.2d 723, 727 (11th Cir.1988) (“[F]oeusing solely on [an employee’s efforts to communicate her concerns to the public], or on the employee’s motivation, does not fully reflect the Supreme Court’s directive that the content, form, and context of the speech must all be considered.”). Thus, whether the speech at issue was communicated to the public or privately to an individual is relevant—but not dispositive.
Given Appellants’ heavy reliance on Lane, we think a quick word on that case’s impact on our precedent is in order. Lane focuses on the “citizen” aspect of the Gar-cetti analysis. In Lane, the Court held that the First Amendment “protects a public employee who providefs] truthful sworn testimony, compelled by subpoena,” where testifying in court proceedings is outside the scope of the employee’s “ordi *1163 nary job responsibilities.” Lane, 134 S.Ct. at 2374-75. In so holding, the Court relied specifically on the nature of compelled testimony. Id. at 2379-80. It found that any obligations an employee may have, as an employee, to her government employer are “distinct and independent from the obligation, as a citizen, to speak the truth” when offering sworn testimony in judicial proceedings. Id. at 2378-79 (noting “the obligation borne by all witnesses testifying under oath”). This “independent obligation” rendered the employee’s sworn testimony “speech as a citizen and set[ ] it apart from speech made purely in the capacity of an employee.” Id. at 2379.
The Court’s holding in Lane is a narrow one. Because it was “undisputed that [the employee’s] ordinary job responsibilities did not include testifying in court proceedings,” the Court “deeide[d] only whether truthful sworn testimony that is not a part of an employee’s ordinary job responsibilities is citizen speech on a matter of public concern.” Id. at 2378 n. 4. Lane reinforces Garcetti’s holding that a public employee may speak as a citizen even if his speech involves the subject matter of his employment and clarifies the critical inquiry for retaliation claims. See Lane, 134 S.Ct. at 2379. The Court’s repeated use of the term “ordinary” in reference to the phrase “job duties,” see, e.g., id. at 2375, 2377-78, and its confirmation that speech that merely concerns information acquired in the course of employment is not “employee speech” narrowed the field of employee speech left unprotected by Garcetti—but this is not a substantial shift in the law. It is, if anything, a slight modification and a useful clarification.
IV.
Here, Appellants challenge the district court’s determination that they spoke as employees on matters related to the mission of their public employer—and not as citizens on matters of public concern. They offer three main reasons why their Memorandum constitutes protected speech: (1) Appellants took action that was not required by any job duty; (2) the Memorandum’s protests impacted matters of public concern, including “the safety and well-being of students” and “client care”; and (3) Appellants directed their concerns to persons “well outside [their] chain of command.” Appellees counter that Appellants’ speech owed its existence to Appellants’ ordinary job duties and that the Memorandum was nothing more than an internal complaint submitted to Dr. Lee-Barber’s supervisors complaining about Dr. Lee-Barber’s managerial style. We find that Appellants spoke as employees about matters of only personal interest, and their speech is therefore beyond the protection of the First Amendment.
A.
We first look to whether Appellants spoke as citizens or as employees. See Garcetti, 547 U.S. at 418, 126 S.Ct. at 1958; Boyce, 510 F.3d at 1342. According to Appellants, their speech owed its existence to their job responsibilities only to the extent that they would not otherwise have been in a position to know of the matters about which they complained. They argue that their ordinary job duties did not include raising ethical issues, protesting their supervisor’s professional incompetence “in the area of mandated assessments,” or critiquing the Center’s operations. Appellants contend that individual counseling was their “primary job,” and, while certain Appellants had “limited administrative/supervisory duties,” Appellants were not charged with “ultimate responsibility of the Center’s programs” and were not “ultimately responsible for its opera- *1164 turns.” In short, Appellants argue that because they were not paid to offer a referendum on Dr. Lee-Barber’s management or the Center’s operations, their Memorandum does not amount to employee speech. Cf. Garcetti, 547 U.S. at 421-22, 126 S.Ct. at 1959-60.
As the Supreme Court observed in Gar-cetti formal job descriptions “often bear little resemblance to the duties an employee actually is expected to perform.” Id. at 424-25, 126 S.Ct. at 1962. Instead, Garcetti and its progeny require a “functional review” of an employee’s speech in relation to her duties or responsibilities. See Abdur-Rahman, 567 F.3d at 1285. Here, Appellants claim that their only employment duties related to individual counseling and some administration and supervision. These duties, as described by Appellants, can be read narrowly so as not to mandate the act of speaking, but such a reading would disregard the actual activities engaged in by Appellants at the Center as well as the purpose served by the Memorandum.
As a group, ■ Appellants supervised employees, trainees, and other staff; trained interns, candidates, and practicum students; assessed at-risk students; and counseled individuals, couples, and groups. Dr. Arranz was the Crisis Response Coordinator for the Center; he helped develop both the Mandated Safety Assessment Program and the procedures used in assessing a student through the Program. Dr. Reid was the Associate Director on Duty when Dr. Lee-Barber was unavailable; she also supervised staff and trainees, assisted in the coordination of clinical services, and was a consultant to the Office of the Dean of Students. Dr. Alves was the Internship Training Director and served on the Center’s Executive Committee. Dr. Gunter was the Coordinator of Practicum Training, and Dr. Bosshardt coordinated the Center’s Mind-Body programs — both provided general clinical services. More than a few of. Appellants, then, served in supervisory roles at and managed programs administered by the Center.
The Memorandum details how Dr. Lee-Barber’s conduct affected Appellants’ ability to. fulfill these roles. Drs. Arranz and Reid performed mandated assessments; Appellants stated that Dr. Lee-Barber’s lack of necessary knowledge compromised their ability to perform these mandated assessments and to manage risk and crisis. Dr. Reid assisted in the development of policies and procedures for the Center; Appellants complained that Dr. Lee-Barber lacked understanding about “some” of the Center’s policies and procedures. Drs. Reid, Alves, Gunter, and, to some extent, Arranz supervised, trained, and recruited candidates into the Center’s training programs; Appellants complained that Dr. Lee-Barber’s mismanagement impacted the Center’s ability to recruit and retain qualified candidates. Appellants provided clinical services to the student body, faculty, and staff at the University; Appellants complained that Dr. Lee-Barber was an incompetent manager of personnel, “the primary clinical resource of the Center.” In short, each complaint or concern relates back to Appellants’ ordinary duties.
Activities undertaken in the course of performing one’s job are activities undertaken “pursuant to employment responsibilities.” See Garcetti, 547 U.S. at 422-24, 126 S.Ct. at 1960-61. Appellants raised concerns about Dr. Lee-Barber in the course of performing — or, more accurately, in the course of trying to perform — their ordinary roles as coordinators, psychologists, committee members, and supervisors. Each complaint in the Memorandum was made in furtherance of their ability to fulfill their duties with the goal of correct *1165 ing Dr. Lee-Barber’s alleged mismanagement, which interfered with Appellants’ ability to perform. See D’Angelo v. Sch. Bd., 497 F.3d 1203, 1210-12 (11th Cir.2007) (finding high-ranking employee’s broad administrative responsibilities rendered speech “to fulfill his professional duties” unprotected); see also Winder v. Erste, 566 F.3d 209, 215 (D.C.Cir.2009) (“[Employee’s speech] was an attempt to ensure proper implementation of [his duties] and was therefore offered pursuant to his job duties.”). While the Memorandum does not bear the hallmarks of daily activity, it was drafted and submitted by Appellants in the course of carrying out their daily activities. See, e.g., Paske v. Fitzgerald, 785 F.3d 977, 984 (5th Cir.2015) ("When speech-related activities are required by one’s position or undertaken in the course of performing one’s job, they are within the scope of the employee’s duties.” (internal quotation marks omitted)), petition for cert, docketed, No. 15-162 (Aug. 5, 2015). Thus, it is evident that Appellants’ speech “owes its existence” to their professional responsibilities, Garcetti, 547 U.S. at 421, 126 S.Ct. at 1960, and it “cannot reasonably be divorced from those responsibilities,” Abdur-Rahman, 567 F.3d at 1283.
Further, we do not agree that speech regarding conduct that interferes with an employee’s job responsibilities is not itself ordinarily within the scope of the employee’s duties. Implicit in Appellants’ duty to perform their roles as psychologists, committee members, supervisors, and coordinators is the duty to inform, as Appellants put it, “those that would appear to have the most need to know and best opportunity to investigate and correct” the barriers to Appellants’ performance. For example, in Boyce, two employees at the Department of Family and Children Services complained to their supervisors about the size of their caseloads, which they viewed to be the result of mismanagement of internal administrative affairs. 510 F.3d at 1344-45. The plaintiffs were case workers; they were responsible for investigating the cases of children allegedly at risk and making recommendations to their supervisors. Id. at 1336, 1343. Still, we found that the plaintiffs'spoke “pursuant to [their] employment responsibilities” in reporting conduct that affected the plaintiffs’ ability to manage their cases, close cases, and meet deadlines. Id. at 1345-46 (internal quotation marks omitted). In other words, in reporting conduct that interfered with their ordinary job duties, the plaintiffs in Boyce spoke pursuant to those duties. And the same is true of Appellants here.
Because Appellants spoke ,as employees, not as citizens, their Memorandum does not implicate the First Amendment. See id. at 1343.
B.
Our inquiry could—but does not— end here.[5] Under Garcetti’s second threshold prong, we next ask whether Appellants’ speech “addressed an issue relating to the mission of [the Center] or a matter of public concern.” See id. at 1342. Appellants acknowledge that some of their protests “were directed to personal employment 'situations,” but they argue that *1166 the “main thrust” of their Memorandum was the treatment of student mental health issues by the Center and the impact of that treatment on student health. The district court correctly concluded, however, that the form, content, and context of the Memorandum, as construed in the light most favorable to Appellants, indicate that Appellants were speaking as employees on conduct that interfered with their job responsibilities, rather than as citizens on matters of social, political, or other civic concern.[6] See Connick, 461 U.S. at 146, 103 S.Ct. at 1690.
After Connick, “courts have found speech that concerns internal administration of the educational system and personal grievances will not receive constitutional protection.” Maples v. Martin, 858 F.2d 1546, 1552 (11th Cir.1988); see Ferrara v. Mills, 781 F.2d 1508, 1516 (11th Cir.1986) (finding teacher’s complaints about manner of course registration and course assignments unprotected). “However, [an employee] whose speech directly affects the public’s perception of the quality of education in a given academic system find[s her] speech protected.” Maples, 858 F.2d at 1553. Further, while speech that “touch[es] upon a matter of public concern” may be considered protected speech, see Connick, 461 U.S. at 149, 103 S.Ct. at 1691, our determination must be based on the record as a whole, see id. at 147-48, 103 S.Ct. at 1690; see also Abdur-Rahman, 567 F.3d at 1284 (cannot consider facts in isolation).
In this case, we find that Appellants’ speech did not constitute speech on a matter of public concern. Their Memorandum is focused on their view that Dr. Lee-Barber is a poor leader and a deficient manager, and how Dr. Lee-Barber’s conduct adversely affected them and other employees of the Center. See, e.g., Watkins v. Bowden, 105 F.3d 1344, 1353 (11th Cir.1997) (per curiam) (finding employee’s complaints about how colleagues behaved toward her and how that behavior affected her work were not protected). The Memorandum sets forth a litany of complaints, including that Dr. Lee-Barber interfered with Appellants’ “ability to optimally perform daily required tasks,” mismanaged personnel, failed to maintain positive relationships with trainees, was hostile to feedback, encouraged certain testimony in pending tenure revocation proceedings, and treated “staff of color” differently from “white-identified staff.”[7]
Appellants contend that, even if many of their complaints are private in nature, the Memorandum as a whole is grounded in the public interest. They contend that the sufficiency of mental health services provided by public institutions to students, *1167 faculty, and staff is a matter of extreme public importance. These public concerns, they argue, are reflected in their complaints about Dr. Lee-Barber’s deficient management of Center operations and failure to maintain positive trainee relationships, both of which Appellants contend affect the quality of services provided by the Center and jeopardize the Center’s reputation. We recognize that the question of what constitutes proper care in the treatment of mental health issues is a matter worthy of a public forum. But, we find that, while the Memorandum may touch up against matters of public concern, it is not directed to such concerns. See, e.g., Boyce, 510 F.3d at 1344-45.
In its introductory remarks, the Memorandum makes vague and sweeping references to “an adverse impact on client care,” “the safety and well-being of students,” and the Center’s “ability to provide a safe environment to ... students,” without reference to specific instances in which the Center failed to effectively manage risk or to provide quality care. On the other hand, the Memorandum goes into great detail and offers specific examples when addressing Appellants’ personal grievances and frustrations with Dr. Lee-Barber’s management of the Center. It refers to Dr. Lee-Barber’s deficient ideological approach to clinical work, refusal to address staff concerns, poor communication style, “singular way of examining issues,” and displays of “significant emotional distress.” See, e.g., Mpoy v. Rhee, 758 F.3d 285, 291 (D.C.Cir.2014) (“[Unprotected speech] list[ed] a litany of complaints indicating that the school, and particularly its principal, had been interfering with [the employee’s] ‘primary duty.’ ”). Appellants sought a “stable work environment” to enable them to “carry out all aspects of their work” and “to optimally perform daily required tasks.” Upon a careful reading, the public simply does not factor into Appellants’ concerns.
We have said before that “the relevant inquiry is not whether the public would be interested in the' topic of the speech at issue,” it is “whether the purpose of [the employee’s] speech was to raise issues of public concern.” Maggio v. Sipple, 211 F.3d 1346, 1353 (11th Cir.2000) (emphases added) (internal quotation marks omitted); see also Linhart v. Glatfelter, 771 F.2d 1004, 1010 (7th Cir.1985) (Connick “requires us to look at the point of the speech in question: was it the employee’s point to bring wrongdoing to light? Or to raise other issues of public concern, because they are of public concern? Or was the point to further some purely private interest?”). Appellants’ speech, while ostensibly intertwined with the services provided by the Center, was not intended to address a matter of public concern from the perspective of a citizen. See Boyce, 510 F.3d at 1344-45. It was only incident to voicing their personal concerns that Appellants’ remarks touched upon matters that might potentially affect the student body. See Pearson v. Macon-Bibb Cty. Hosp. Auth., 952 F.2d 1274, 1278 (11th Cir.1992); see also Gomez v. Tex. Dep’t of Mental Health & Mental Retardation, 794 F.2d 1018, 1022 (5th Cir.1986) (“Whatever the significance of [the] speech ..., he was not seeking to alert the public to any actual or potential wrongdoing or breach of the public trust....”). The “main thrust” of the Memorandum’s content “took the form of a private employee grievance.” Morgan, 6 F.3d at 755.
Given its form and context, Appellants’ Memorandum did not relate to a matter of public concern. As to form, Appellants used the Memorandum as an internal channel through which they could, in their capacities as employees at the Center, relay to Dr. Lee-Barber’s supervisors and *1168 other University officials what they believed to be Dr. Lee-Barber’s deficient management and poor leadership.
Also, although not dispositive to our inquiry, Appellants made no attempt to make their concerns public. See id. at 754; Kurtz, 855 F.2d at 727. The issues outlined in the Memorandum were raised, discussed, investigated, and resolved privately, see Connick, 461 U.S. at 148 n. 8, 103 S.Ct. at 1691 n. 8, and without any intervention from or communication with outside persons or agencies, cf. Pickering, 391 U.S. at 564, 88 S.Ct. at 1732-33 (employee sent letter to local newspaper); Akins, 420 F.3d at 1304 (employee requested special meeting with public official); Maples, 858 F.2d at 1549 (employee’s criticisms published in public report). Accordingly, the means by which Appellants communicated their concerns further supports that this was a private employee grievance.
V.
We find that the district court correctly concluded that the speech for which the Appellants seek First Amendment protection was made by them as employees and not as citizens, and on matters related to their employment and not public concern. Therefore, the district court’s grant of summary judgment to Appellees is AFFIRMED.

. The Memorandum was jointly drafted, signed, and submitted by seven signatories using one voice. Drs. Moghaddam and Ale-mu, however, resigned from their positions at the Center prior to the reduction in force that was the impetus for the instant action. Appellants are the five remaining signatories and the only signatories asserting a claim for retaliation. Therefore, in the interests of clarity and continuity, we will refer to statements and assertions made in the Memorandum as being made by ''Appellants” rather than "the signatories.”

. On December 15, 2011, Drs. Alves, Arranz, Gunter, Moghaddam, and Reid submitted a complaint to the ODDEP. They complained that Clark and Walker "were biased, made inappropriate and/or insensitive comments, and [they] felt that due process was not offered to [either side]” during the investigation. They also alleged Dr. Lee-Barber had "creat[ed] a hostile work environment, unfairly enforce[ed] departmental policy, retaliated against some of the [staff] for taking their concerns to the Division leadership ..., discriminated against some of the employees due to their race and/or sexual identity, bullied, mobbed, and participated in favoritism.” Linda Nelson, Assistant Vice President for the ODDEP, investigated the psychologists' complaint. She found no evidence of racial discrimination and concluded that Clark and Walker’s investigation was not conducted improperly.

. After the district court entered its order and prior to filing this appeal, Appellants filed a *1159 consent order to amend their complaint to withdraw their remaining claims, terminating the case below. Appellants filed their notice of appeal in this court following entry of judgment on Appellants' freedom of speech claims below. See 28 U.S.C. § 1291; see also Barfield v. Brierton, 883 F.2d 923, 930 (11th Cir.1989).

. Following Pickering, our analysis of a public employee's claim that her employer’s disci *1160 plinary action was in retaliation for constitutionally protected speech has had four parts, requiring an employee to show that “(1) the speech involved a matter of public concern; (2) the employee's free speech interests outweighed the employer’s interest in effective and efficient fulfillment of its responsibilities [i.e., the Pickering balance]; and (3) the speech played a substantial part in the adverse employment action.” Cook v. Gwinnett Cty. Sch. Dist., 414 F.3d 1313, 1318 (11th Cir.2005). If the employee satisfies her burden on these first three parts, (4) the burden shifts to the employer to show that it would have made the same employment decision even in the absence of the protected speech. Id. The first two parts are questions of law to determine whether the employee's speech is protected; the last two parts are questions of fact that address the causal link between the speech and the adverse employment action. See id.; see also Battle, 468 F.3d at 760. After Garcetti, we modified the first step in our four-part analysis to account for Garcetti’s two-step inquiry. See, e.g., Boyce v. Andrew, 510 F.3d 1333, 1342 (11th Cir.2007) (per cu-riam). Thus, the first part of this circuit's Pickering analysis now asks whether the employee spoke as a citizen and whether the speech involved a matter of public concern. See id.; see also Vila v. Padrón, 484 F.3d 1334, 1339 (11th Cir.2007).

. Appellants request “credit” for statements within the Memorandum that the Memorandum "[was] not an employee grievance” and "not merely [a compilation of] employee grievances.” While we are required to view the facts in the light most favorable to Appellants as the nonmoving parties, Ave. CLO Fund, Ltd., 723 F.3d at 1294, such statements are not “facts.” Rather, such statements are conclusions designed to have legally operative effects. See, e.g., Avirgan v. Hull, 932 F.2d 1572, 1577 (11th Cir.1991). While we appreciate Appellants’ characterization of their speech, it is the province of the court to determine whether the Memorandum is an employee grievance. See, e.g., Moss, 782 F.3d at 618 (stating that both prongs of Garcetti are questions oflíiw).

. If the speech at issue was Appellants’ truthful testimony at the subject tenure revocation proceeding, Lane might require a conclusion different from the one that we reach today. However, Appellants’ stated concern was Dr. Lee-Barber’s alleged "misuse of her authority and power in encouraging a certain level of participation” in the revocation proceedings. Neither Appellants’ testimony nor the proceedings themselves are discussed in the Memorandum.