Frank KELLER, Plaintiff,

v.

CITY OF TALLAHASSEE,
et al., Defendants.

Case No. 4:14cv590-MW/CAS

United States District Court,
N.D. Florida,
Tallahassee Division.

Signed November 23, 2015

James Garrity, Marie A. Mattox, Marie A. Mattox PA, Tallahassee, FL, for Plaintiff.

Hetal Harshad Desai, Michael Patrick Spellman, Todd Cameron Hunter, Jr., Sniffen & Spellman PA, Tallahassee, FL, Ginger Barry Boyd, Lacey Delori Corona,

Broad & Cassel, Destin, FL, for Defendants.

## ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Mark E. Walker, United States District Judge

If you resign from public employment in order to avoid the stigma of being fired but your government employer subsequently reports you as having been fired anyway, do you have any recourse under federal law? Under the circumstances of this case—really, under the circumstances of this case as presented in admissible form in the record—the answer is "no."

Frank Keller was hired by the Tallahassee Police Department ("TPD") in October of 2013. Keller had rocky relationships with two of his training officers, Mark Lewis and Darrell Begault, and aired many of his gripes with them in two purportedly anonymous critiques that he submitted as part of his training. The critiques contained allegations that Lewis and Begault had lied about certain incidents in daily observation reports ("DORs") submitted in connection with their training of Keller. The lieutenant in charge of the training program, Steve Outlaw, determined that it was Keller who had written the critiques and asked Keller to prepare a document setting out in more detail Lewis's and Begault's alleged misrepresentations. Keller then proceeded to struggle in the later stages of the training program—struggles that Keller claims were due to retaliatory actions on the part of Lewis and others—leading Outlaw to make the decision to remove him from the program and recommend his termination to the Chief of the TPD, Michael DeLeo. Keller retained the services of Stephanie Webster, a lawyer with the Police Benevolent Association ("PBA"), and met with Chief DeLeo twice in an effort to convince DeLeo not to terminate him. Keller eventually resigned on May 9, 2014, believing that his resignation would be better for his future career prospects than termination.

In his Second Amended Complaint, ECF No. 38, Keller brings claims against the City of Tallahassee ("City"), Chief DeLeo in his individual and supervisory capacities, Lt. Outlaw in his individual and supervisory capacities, and Officer Lewis in his individual capacity. In Count I, Keller alleges that the City retaliated against him for reporting various violations of rules and regulations, thus violating Florida's whistleblower statutes. In Counts II and III, Keller alleges that Defendants retaliated against him for engaging in speech protected by the First Amendment. In Counts IV and V, Keller alleges that Defendants violated his due process rights by denying him a name clearing hearing and abusing their power. Defendants moved for summary judgment on all counts, ECF No. 54, and Keller filed a memorandum in opposition, ECF No. 60. For the reasons set forth below, Defendants' motion is granted as to Counts II, III, IV, and V of the Second Amended Complaint. This Court declines to exercise supplemental jurisdiction over the remaining state-law claim (Count I), and so Keller's Second Amended Complaint is dismissed without prejudice as to that claim.

## SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine" if the record is such that a reasonable jury could return a verdict for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Material" facts are those that might affect the out-

come of the case under the governing substantive law. *Id.*

While this Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in its favor, *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), "[i]nferences based upon speculation are not reasonable," *Solliday v. Fed. Officers*, 413 Fed.Appx. 206, 207 (11th Cir. 2011). Failure by the nonmoving party to prove an essential element of its case, for which it has the burden of proof at trial, entitles the moving party to summary judgment. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

## FACTUAL BACKGROUND[1]

Frank Keller was hired by TPD as a recruit officer in late October of 2013. ECF No. 57-1, at 36. He began the field training portion of his training in January of 2014. ECF No. 51-13, at 8. The field training program at TPD consists of four phases. During Phase 1, a recruit officer is paired with a field training officer ("FTO") and "spend[s] four weeks learning basics of the job as well as skills that are considered necessary because of the exposure to potential danger and/or liability." ECF No. 51-14, at 14. In phases 2 and 3, each of which lasts four weeks, the recruit officer is paired with different FTOs and is "introduced to progressively more difficult and advanced tasks." *Id.* Phase 4 lasts only two weeks and requires the recruit to take the lead—the FTO wears civilian clothing and "will not take any action [unless] necessary to avoid liability, injury or violation of policy." *Id.* at 15. Throughout training, the FTO documents the recruit officer's performance each day in a daily observation report ("DOR"), which includes numerical ratings in a number of categories. ECF No. 51-14, at 21.

Keller's FTO during Phase 1 was Officer Mark Lewis. ECF No. 51-13, at 1–2 ¶ 4. It was not a happy relationship; still, Keller was passed on to Phase 2, where he was paired with FTO Darrell Begault. ECF No. 51-15, at 1 ¶ 3. Keller and Begault had a less unhappy relationship, though Keller felt that Begault was lazy and unprofessional. ECF No. 57-1, at 122–23. Keller moved on to Phase 3 in early March of 2014. ECF No. 51-15, at 1 ¶ 3.

Keller had a better experience in Phase 3 with FTO Michele Yown. Keller felt she was an improvement over Lewis and Begault and had few problems with her. ECF No. 57-1, at 117–18. When Yown was out one day during Phase 3, Keller was assigned to FTO Jordan Larremore. *Id.* at 131. Larremore told Keller that he had heard that Keller was lazy, which naturally upset Keller. *Id.* Keller persisted in trying to learn more from Larremore about his reputation among the training officers, which prompted a meeting with Sersgeant Tina Haddon, Larremore, and FTO Yown. *Id.* at 131–32. During that meeting, Haddon told Keller that Lewis had been saying negative things about him: that he was lazy; that he didn't have a good work ethic; and that he wasn't fighting for a job. *Id.* at 129. Keller shared some of his gripes about Lewis and discussed in more general terms his concerns about his reputation. *Id.* at 129; ECF No. 51-17, at 71. Keller also alleged for the first time that "Lewis was not completely truthful" on the DORs during Phase 1. ECF No. 51-1, at 2.

Keller continued in Phase 3 with Larremore as his FTO. ECF No. 57-1, at 112. On April 3, 2014, just before the end of Phase 3, Keller and Haddon had a long

---

1. The basic facts of the case are sketched out here for context, but the speech acts forming the basis of Keller's First Amendment claims are described in detail *infra* Part II.B.2.

conversation in which Keller again voiced his concerns about Lewis and the training program in general. *Id.* at 62–63; ECF No. 51-17, at 4–5 ¶ 9. Haddon learned during this meeting (or the next day) that Keller had not completed the required critiques—evaluations of the training program, including evaluations of the FTOs—for Phases 1 and 2 and made him fill out these critiques. ECF No. 57-1, at 63–64; ECF No. 51-17, at 5 ¶ 12. The critiques were supposed to be anonymous and, according to Keller, were not supposed to even be looked at by higher-ups until the end of the training program. ECF No. 57-1, at 88–89. Keller included in his critiques allegations that Lewis and Begault had included false information on DORs. ECF No. 51-14, at 37–40. Keller then moved on to Phase 4, where he was once again paired with Lewis. *Id.* at 1–2 ¶ 4.

On April 8, Lt. Outlaw received the critiques and deduced that they were written by Keller. *Id.* at 4 ¶ 13. Two days later, Outlaw met with Keller and Sergeant Melissa Yown,[2] who was Keller's field training sergeant in Phase 4. ECF No. 57-1, at 136–37; ECF No. 51-16, at 1 ¶ 2. Outlaw informed Keller that he was going to switch his FTO from Lewis to Officer Beth Bascom based on the critiques. ECF No. 57-1, at 136–37. Outlaw also told Keller that he needed to look into the allegations contained in the critiques, and that he would contact Keller. *Id.* at 137. Following the meeting, Outlaw shared "the substance of [Keller's] allegations with" various higher-ups, including Chief DeLeo. ECF No. 51-14, ¶ 15.

Keller did not hear from Outlaw for a few days, prompting him to contact Outlaw and set up a meeting. ECF No. 57-1, at 160–61. On April 16, Keller met with Outlaw. Keller first brought up the topic of changing squads; Outlaw rejected this suggestion. *Id.* at 167–68. Keller then brought

up the critiques. According to Keller, Outlaw responded as follows:

> "He said, 'You need to really re-evaluate what you're stating here, Officer Keller. Officers can lose their certifications. That is an important FDLE document.' ... And I told him it seemed intimidating to me to say, 'Well, I'll re-evaluate it.'"

*Id.* at 169. Outlaw eventually accepted that Keller was "sticking to his story" and asked him to prepare a pair of documents—"rebuttals"—detailing Lewis's and Begault's lies in greater detail. *Id.* at 170. Following the meeting, Keller prepared the rebuttals. *Id.* at 178–79. He did not send them to Outlaw, but rather e-mailed them to himself in addition to saving a copy on his laptop. *Id.* at 179.

The following day, Keller was "re-phased"—that is, sent back to Phase 3. *Id.* at 191. Keller spent approximately six days under FTO Bascom in rephased Phase 3, *id.* during which time his performance, according to Bascom and Sgt. Yown, was subpar, ECF No. 51-18, at 2–3 ¶¶ 6–10; ECF No. 51-16, at 3–4 ¶¶ 8–10. On April 25, Bascom and Sgt. Yown talked to Keller near the end of the work day. According to Keller, Sgt. Yown told him, "We don't know if it's going to work out here." ECF No. 57-1, at 196. Keller told Sgt. Yown that he wanted to speak with someone else. *Id.* Outlaw then arrived at the meeting and asked Keller to resign:

> "He says, 'Keller, we want you to resign.' ... I was like, 'It's not even the end of the workweek yet.' He was like, 'There's not enough time.' ... I said, 'Sir, you didn't even get my [rebuttal] report. You know, you said it was with Lewis.' Right at that point, he tells Officer Bascom to go confiscate my computer.... [O]nce I stated I made these reports, he took my gun belt. Without

---

2. Sgt. Yown is FTO Yown's sister. ECF No. 51-11, at 42.

me signing off on anything, he took my computer. . . . He stated that is was—you know, 'This is my recommendation.' I said, 'Who can I talk to?' He said, 'There's no one else you can talk to. . . . You are a probationary employee. You know, this is your only option.' He said I would resign, like, three times. Three or four times he said, 'You're going to resign. That's the end of it,' you know. And I asked him who was—who I could talk to, and he said, 'We'll see who's in the office on Monday.' "

*Id.* at 198–200.

Following this interaction, Outlaw informed Major Lewis Johnson of the situation with Keller. ECF No. 51-14, at 7 ¶ 21. Outlaw told Johnson in an e-mail that Keller had been "unplugged" from the training program and placed on administrative leave "pending his resignation or termination." *Id.* at 47. Outlaw mentioned "our intent to terminate [Keller] from the training program" and that "we are seeking [Keller's] termination." *Id.* Keller, meanwhile, believing that he had a right under department policy to talk to someone else, e-mailed Chief DeLeo and asked for a meeting. ECF No. 57-1, at 200–01. DeLeo responded that Keller should call on the following Monday morning to schedule a meeting. ECF No. 51-12, at 8. The next morning, Major Johnson forwarded Outlaw's e-mail to Chief DeLeo. *Id.* at 9. DeLeo responded that he was "confident that Training has the documentation to support their recommendation" to terminate Keller. *Id.* At some point on this day or perhaps the next, Keller called the PBA to see if he could have a representative come with him to the meeting on Monday. ECF No. 57-1, at 202. He was told to come in with all his documents on Monday morning. *Id.*

At some point before the meeting on Monday, Outlaw prepared a "staff summary report" outlining the issues with Kel-

ler and concluding with a recommended course of action:

Option-1: Allow Recruit Officer Keller the opportunity to resign, in lieu of termination. Terminate immediately if he does not wish to resign.

Option-2: Continue in training.

ECF No. 51-12, at 13. This report was provided to Chief DeLeo before the meeting on Monday. *Id.* at 2 ¶ 8.

On Monday, April 28, Keller and his PBA representative, Stephanie Webster, met with DeLeo, Outlaw, and a number of other TPD officers. ECF No. 51-1, at 6. Upon learning that Keller had completed the rebuttal reports but had not turned them in to Outlaw, DeLeo told Keller he wanted a copy of the reports. *Id.* DeLeo told Keller he was going to conduct his own investigation. *Id.* at 7.

The next day, Webster e-mailed DeLeo thanking him for taking the time to meet with Keller. ECF No. 51-12, at 14. She enclosed a letter from Keller in which he tried to explain his actions and low training scores and more or less made the case for being retained. *Id.* at 15–16. At some point, a second meeting was set up between Keller and DeLeo.

Keller and DeLeo met again on May 6. *Id.* at 3–4 ¶¶ 13–15. The meeting largely concerned the question of why Keller signed off on DORs that had information he felt was false, and Keller's alleged propensity for wearing wrinkled pants. ECF No. 57-1, at 212–13. Another meeting was set up for the next day. ECF No. 51-12, at 4 ¶ 15. However, the next morning, Webster e-mailed DeLeo and told him that while she would be happy to attend the meeting scheduled for that afternoon, she was not sure Keller "ha[d] much more to add to what he told you yesterday." *Id.* at 21. She told DeLeo that she "would rather wait to meet after you have a had [sic] the opportunity to look everything over." *Id.*

An hour later, Webster sent DeLeo another e-mail. *Id.* at 22. In this e-mail, she asked DeLeo to compare Keller's scores to those of other recruits and said that "Keller strongly believes that his termination was motivated by his critiques of his FTO[s] and the training program." *Id.* Webster also told DeLeo in this e-mail that "[i]f you do choose to terminate Officer Keller, I would appreciate the opportunity to allow him to resign instead." *Id.* DeLeo didn't reply to Webster until that evening, at which point he told her that he would call her the next day to discuss the situation. *Id.* at 24.

The next day—May 8, 2014—Webster called Keller. According to Keller, their conversation went as follows:

> "[She told] me Chief DeLeo would accept my resignation on my behalf if I turned in my equipment and a letter of resignation by 10:00 A.M. 05/09/2014.... Before agreeing to this, I consulted with Mrs. Webster and she advised if I take this any[ ] further I would most likely not get a job in law enforcement in the state of Florida. Mrs. Webster clarified that if I resigned it would be my own decision and other departments would not know of the situation at hand. Mrs. Webster said by law they cannot say anything bad against you if you resign. If a future employer calls the [TPD], they have to simply say you resigned for your own reasons."

ECF No. 51-1, at 7. Keller also maintains that Webster told him the following things, though he does not explicitly state that she told him these things on May 8: that DeLeo was "following [Outlaw's] protocol," ECF No. 57-1, at 27; that by resigning, his departure would be noted as a "voluntary separation not involving misconduct," *id.* at 34; and that he could resign in lieu of termination, *id.* at 206–07. Keller does not know what the details were of any conversation between Webster and DeLeo on

May 8. *Id.* at 32, 34, 204. The next day, Webster helped Keller prepare a resignation letter, which he then submitted. *Id.* at 217.

Following his departure from TPD, Keller applied to work at a number of different law enforcement agencies but found little success. ECF No. 51-1, at 12. At numerous interviews, he was asked why he had marked on his application that he had resigned from TPD when his records through the Florida Department of Law Enforcement ("FDLE") indicated that he had failed to satisfactorily complete the TPD's field training program. *Id.* Finally, after Keller's application to be a deputy sheriff with the Leon County Sheriff's Office was denied, Keller called Webster to figure out what was happening. *Id.* at 7. Webster told him that "when she spoke to Chief DeLeo concerning [Keller's] resignation they had the understanding it would be voluntary because of the situation being unclear and there was never any conversation between them concerning Chief DeLeo stating [Keller] failed the program." *Id.* Keller then went to TPD, where he learned that his file did indeed indicate that he had failed to satisfactorily complete the department's training program. *Id.* Keller tried to get Chief DeLeo to change the notation in his file, but DeLeo refused because "the form was accurate" in his estimation. ECF No. 51-12, at 5 ¶ 22.

## DISCUSSION

### I. PROCEDURAL DUE PROCESS CLAIMS

Keller's procedural due process claims against the City (Count IV) and the individual defendants (Count V) require him to establish that Defendants deprived him of some liberty or property interest. Keller did not have a property interest in continued employment with the TPD under § 112.531, Florida Statutes because he was a probationary employee. ECF No.

51-11, at 14; ECF No. 51-4; *Smith v. Town of Golden Beach*, 403 So.2d 1346, 1347–48 (Fla. 3d DCA 1981).[3] Keller's procedural due process claim is instead based on a "stigma-plus" liberty-interest theory, which requires Keller to establish that he has been "stigmatized in connection with a denial of a right or status previously recognized under state law." *Behrens v. Regier*, 422 F.3d 1255, 1260 (11th Cir.2005) (quoting *Smith ex rel. Smith v. Siegelman*, 322 F.3d 1290, 1296 (11th Cir.2003)). Keller claims that Defendants stigmatized him by failing to note the voluntary status of his departure from TPD, thus making it hard for him to find employment as a police officer. ECF No. 60, at 5. Keller maintains that this stigmatization was done in connection with his resignation. *Id.* While resignation is not normally a "denial of a right or status previously recognized under state law," it can be such a denial when the resignation is involuntary. *See Rademakers v. Scott*, 350 Fed.Appx. 408, 411–12 (11th Cir.2009). The parties dispute whether Keller's resignation was voluntary.

### A. Applicable Law

#### 1. Hargray *and Involuntary Resignations*

"[E]mployee resignations are presumed to be voluntary," but there are two ways for a plaintiff-employee to overcome this presumption. *Hargray v. City of Hallandale*, 57 F.3d 1560, 1568 (11th Cir.1995). First, under the "duress" or "coercion" theory, if the plaintiff-employee can show that "the employer's conduct in obtaining the employee's resignation deprived the employee of free will in choosing to re-

sign," then the resignation is deemed involuntary. *Id.* Second, under the "misrepresentation" theory, if "a resignation ... [was] ... induced by an employee's reasonable reliance upon an employer's misrepresentation of a material fact concerning the resignation," then the resignation is deemed involuntary. *Id.* at 1570.

There are numerous factors that are useful in determining whether a resignation was obtained via coercion: "(1) whether the employee was given some alternative to resignation; (2) whether the employee understood the nature of the choice he was given; (3) whether the employee was given a reasonable time in which to choose; (4) whether the employee was permitted to select the effective date of the resignation; and (5) whether the employee had the advice of counsel." *Id.* at 1568. "Resignations obtained in cases where an employee is faced with ... unpleasant alternatives are nevertheless voluntary" so long as the employee has a choice among "real alternatives." *Id.* However, where the alternative to resignation is termination and the employer knows that grounds for termination do not exist, the resignation is deemed involuntary. *Id.*

For a resignation obtained via misrepresentation to be deemed involuntary, "an employee is not required to show that the employer intentionally deceived him"; rather, the question is whether the employee reasonably relied on the employer's misrepresentation, and that the employer knew or should have known that it was making a misrepresentation.[4] *Id.* at 1570–71.

---

**3.** It appears that Keller did not have a property interest pursuant to his contract with the TPD, either, though it is not entirely clear from the record. At any rate, Keller does not press such an argument.

**4.** It is not clear whether an employer even has to be negligent in making the misrepre-

sentation—one case relied upon by the *Hargray* court noted that "the misleading information can be negligently or even innocently provided; if the employee materially relies on the misinformation to his detriment, his retirement is considered involuntary." *Covington v. Dep't of Health & Human Servs.*, 750 F.2d 937, 942 (Fed.Cir.1984). While the *Har-*

### 2. "Actual Termination"

Keller argues that the *Hargray* "involuntary resignation" framework is not the proper legal framework for this case, and that his resignation should be analyzed under an "actual termination" theory. ECF No. 60, at 6–7. As an initial matter, it is not clear whether this theory even applies to public employment cases. At least one court in this circuit has held that the *Hargray* framework is inapplicable in cases involving *private* employers, *see Andazola v. Logan's Roadhouse, Inc.,* 871 F.Supp.2d 1186, 1207–08 (N.D.Ala.2012), and given the long line of Eleventh Circuit cases applying *Hargray* in public employment situations, perhaps it is best understood as the exclusive legal framework to be used in analyzing the voluntariness of resignations for public employees. That said, there is no obvious reason why the actual termination theory should not be applicable to public employees, and so a discussion of this theory is warranted.

 Under an actual termination theory, a termination or discharge occurs when an employer communicates a clear intent to terminate an employee to that employee. *See Andazola,* 871 F.Supp.2d at 1208–09. That intent "may be inferred not only from words but also from conduct, as well as the specific circumstances of the challenged job action." *Thomas v. Dillard Dep't Stores, Inc.,* 116 F.3d 1432, 1437 (11th Cir.1997). "An employer need not use the term 'fired' in order for a discharge to occur. The test of whether an employee was discharged depends upon the reasonable inferences that the employee[ ] could

draw from the language used by the employer." *N.L.R.B. v. Ridgeway Trucking Co.,* 622 F.2d 1222, 1224 (5th Cir.1980).[5]

## B. Analysis

### 1. Duress

 Keller maintains that his resignation was made under duress and was thus involuntary. He offers two distinct theories of duress.[6] First, Keller argues that Outlaw's presentation of the "option[s] of resignation or immediate termination on April 25, 2014" amounted to a coercive action that deprived Keller of free will in making the "choice" to resign. ECF No. 60, at 6–7. Second, Keller argues that Chief DeLeo's ultimatum of May 8, 2014—that he would accept Keller's resignation by 10:00 a.m. the next day—rendered Keller's resignation involuntary either because it was sufficiently coercive or because DeLeo lacked grounds to fire Keller.

The first theory suffers from a fundamental problem: Keller did not actually resign in response to Outlaw's attempted coercion. Even assuming that Outlaw's statements to Keller amounted to the type of coercive behavior that would have rendered a decision to resign on the spot involuntary, that's simply not what happened. Keller's resignation came two weeks and many meetings with Chief DeLeo later, and cannot be said to have been made under duress caused by Outlaw.

The second theory fails for a number of reasons. First, the only evidence in the record that DeLeo gave Keller a "resign

---

gray court appears to have adopted a negligence standard, it did so by relying on a case dealing with a coercion theory of involuntary resignation. *See Hargray,* 57 F.3d at 1570–71 (citing *Schultz v. U.S. Navy,* 810 F.2d 1133, 1136 (Fed.Cir.1987)). At any rate, there is no need to resolve this potential problem in this case.

5. Decisions of the Fifth Circuit prior to October 1, 1981 are binding within the Eleventh Circuit. *Bonner v. City of Prichard,* 661 F.2d 1206, 1207 (11th Cir.1981) (en banc).

6. One theory was presented in Keller's memorandum opposing summary judgment, ECF No. 60, at 6–7, while the other was presented during a telephonic hearing, ECF No. 67.

or be terminated" choice comes via inadmissible hearsay. Keller claims that Webster told him on May 8, 2014 that "Chief DeLeo would accept [Keller's] resignation ... if [he] turned in [his] equipment and a letter of resignation by 10:00 A.M." the next day. ECF No. 51-1, at 7. Keller also states that Webster told him that his resignation would be accepted "in lieu of termination." ECF No. 57-1, at 206–07. These statements are not hearsay under the very narrowest definition of the term since they are not offered to show that DeLeo actually *would* accept Keller's resignation; instead, they are offered to raise the inference that DeLeo *told Webster* that he would accept Keller's resignation by a certain time or else he would fire Keller. However, when the relevance of a statement depends on an implication functionally equivalent to a second statement that would itself be hearsay, the first statement is hearsay. *See Lyle v. Koehler*, 720 F.2d 426, 432–35 (6th Cir.1983); *see also United States v. Reynolds*, 715 F.2d 99, 102–04 (3d Cir.1983) ("when the matter which the declarant intends to assert is different from the matter to be proved, but the matter asserted, if true, is circumstantial evidence of the matter to be proved[,] ... the statement is subject to a hearsay objection") (citations and quotations omitted). In this case, a statement by Webster that DeLeo told her that he would accept Keller's resignation by 10:00 a.m. the next day would be hearsay, and so Webster's statements implying that DeLeo told her the same are themselves hearsay.

The Eleventh Circuit has given some conflicting guidance on whether such hearsay evidence can be considered at the summary judgment stage. The confusion appears to center on the meaning of "reducible to admissible form," a phrase first used in this circuit in *McMillian v. John-*

son, 88 F.3d 1573, 1576 (11th Cir.1996). In *Macuba v. DeBoer*, 193 F.3d 1316 (11th Cir.1999), the court set out to clarify the meaning of this phrase. The *Macuba* court stated that an "out-of-court statement [appearing to be hearsay] made to [a] witness ([a] Rule 56(c) affiant or [a] deposition deponent) must be admissible at trial for some purpose" in order to be considered at summary judgment. 193 F.3d at 1323. This would seem to foreclose the possibility of considering the statements Webster allegedly made to Keller, since Webster's implied assertion that DeLeo told her that Keller needed to resign by the next day does not fit into any hearsay exception or exclusion. However, the Eleventh Circuit has since noted in dicta that "[t]he most obvious way that hearsay testimony can be reduced to admissible form is to have the hearsay declarant testify directly to the matter at trial." *Jones v. UPS Ground Freight*, 683 F.3d 1283, 1294 (11th Cir. 2012). This would seem to suggest that Webster's statements can be considered because Webster herself could testify to what DeLeo told her at trial.[7] As one court in this circuit has noted, the "tension between *Macuba* and *Jones* ... is a source of confusion for many practitioners and judges." *Frierson v. Atlanta Indep. Sch. Sys.*, 22 F.Supp.3d 1264, 1287 (N.D.Ga. 2014).

A close examination of *Macuba* suggests that it furnishes the correct principle applicable to this case. The hearsay at issue in *Macuba* comprised a number of statements allegedly made to a witness and recounted in that witness's deposition and affidavit. *Macuba*, 193 F.3d at 1322. The statements were offered for the truth of their contents. *Id.* at 1325. The court held that these statements could not be considered for purposes of summary judgment because they did not fall within a hearsay

---

7. Webster's testimony would not itself contain hearsay because DeLeo's statements would fall under the "party-opponent" exclusion. *See* Fed. R. Evid. 801(d)(2).

exception. *Id.* Even if the statements could be admitted at trial for impeachment purposes, they could not be considered as substantive evidence. *Id.* Notably, the court did *not* consider the fact that the hearsay declarants—one of whom had submitted his own affidavit for purposes of summary judgment, *see id.* at 1325 n.19—could testify at trial as to what they had told the deponent sufficient to render the hearsay evidence "reducible to admissible form." To the extent that *Jones* is in conflict with this aspect of *Macuba*, the earlier case controls. *See Walker v. Mortham*, 158 F.3d 1177, 1188–89 (11th Cir.1998) (adopting "earliest case" rule for intracircuit splits). *Macuba* dictates that Keller's testimony about what Webster told him regarding Chief DeLeo's willingness to accept his resignation cannot be considered at this stage. Without that evidence, there is nothing in the record that supports the inference that DeLeo ever gave Keller (directly or through Webster) a stark "resign or be fired" choice,[8] and therefore a reasonable jury could not find that DeLeo extracted Keller's resignation through duress.

Moreover, even if evidence of what Webster told Keller concerning DeLeo's willingness to accept his resignation could be considered for purposes of summary judgment, DeLeo's alleged "ultimatum" was not sufficiently coercive to render Keller's resignation involuntary. By the time of the ultimatum, Keller had had almost two weeks to ponder his alternatives—the same alternatives that Outlaw had presented to him. Furthermore, Keller had the advice of counsel. He was also given at least one night to "sleep on it" and come to a decision. Courts in this circuit have required circumstances to be much more unpleasant for an employee before deeming his resignation to be even arguably involuntary under a duress theory. *See, e.g., Poindexter v. Dep't of Human Res.*, 946 F.Supp.2d 1278, 1286–87 (M.D.Ala. 2013) (denying summary judgment to defendants on coercion theory when plaintiff was told that her conduct constituted a crime, that she needed to make a decision as soon as possible, and that while she could talk to a lawyer, the evidence against her was "overwhelming").

Keller's argument that DeLeo's alleged ultimatum was coercive because DeLeo lacked good grounds to terminate Keller also fails on its merits, evidentiary shortcomings aside. For this theory to work, Keller would have to show that DeLeo *knew* the reasons for termination were not sufficient. There is no way a reasonable jury could arrive at that conclusion. Certainly Keller argued to DeLeo that the DORs contained falsehoods and that Lewis and Begault had given him lower scores than he deserved.[9] ECF No. 57-1, at 210–

---

8. In fact, DeLeo's deposition testimony and affidavit suggest that he did not: DeLeo claims he does "not recall a ... conversation with [Webster]" on May 8, 2014, ECF No. 51-12, at 4 ¶ 17, and that he never gave Keller a "resign or be terminated" choice, *see id.* at 12–13, 5 ¶¶ 20–21. Even if Webster's implied assertion that DeLeo told her he would accept Keller's resignation in lieu of termination were potentially admissible under the theory that *DeLeo* could testify at trial to that effect, DeLeo's affidavit to the contrary forecloses that possibility. *See Jones*, 683 F.3d at 1294 ("if ... [a] declarant has given sworn testimony during the course of discovery that contra-

dicts the hearsay statement, we may not consider the hearsay statement at the summary judgment phase").

9. At a telephonic hearing, ECF No. 67, Keller raised additional "falsehoods" that he claims DeLeo relied upon in making his decision. Keller claims that Lewis and Bascom falsified DORs (or perhaps just gave him lower scores) in Phase 4 and rephased Phase 3 after Keller wrote his critiques, leading Keller to have lower scores in Phase 3 and making it appear that he didn't pass Phase 4. DeLeo then relied on these facts in making his decision. The claim that anyone falsified documents to show that Keller didn't finish Phase 4 makes

12, 219–20. And DeLeo could have had an inkling that Outlaw's recommendation, based as it was in part on those scores and on other scores that Keller felt were retaliatory, was itself perhaps suspect. But DeLeo simply didn't believe Keller. For instance, his assessment of the rebuttals was that they "look[ed] like someone . . . trying to rebut their DORs three months later based on a difference in perception." ECF No. 57-2, at 17. DeLeo "did not believe either FTO Lewis or FTO Begault had lied in their evaluations" of Keller. ECF No. 51-12, at 3 ¶ 12. Crucially, DeLeo did not arrive at these conclusions without getting Keller's input or without considering more than just Keller's scores during training. *Id.* at 3–4 ¶¶ 10–14. The record also shows that DeLeo called Dr. Linda Enfinger, a psychologist who works with TPD and whom Keller had seen. *Id.* Even considering all this in the light most favorable to Keller, a reasonable jury could not conclude that DeLeo was making an empty threat in giving Keller a "resign or be fired" ultimatum—an ultimatum whose existence cannot even be inferred based on this record.

Keller's various duress theories fail. Any coercive behavior by Outlaw had no causal connection to Keller's resignation, and there is no evidence in the record reducible to admissible form that would allow a reasonable jury to find that DeLeo extracted Keller's resignation by coercive means. Even if it were to consider the inadmissible evidence, a jury could not rea-

sonably find that DeLeo's behavior was sufficiently coercive so as to render Keller's resignation involuntary.

### *2. Misrepresentation*

 There are two possible misrepresentations in this case. The first and most obvious is the express misrepresentation that if Keller resigned, TPD would not be able to "say anything bad against" him and he wouldn't "get anything failing or anything like that." The second is the implied misrepresentation that resignation would have different consequences going forward than termination. That is, the presentation of resignation as an alternative to termination implies that resignation would lead to a better outcome. Unfortunately for Keller, there is not enough evidence reducible to admissible form in the record to support either theory.

It is abundantly clear that Keller thought that resigning would prevent the TPD from "say[ing] anything bad against" him to other departments and would not affect his future job prospects to the same extent that termination would. ECF No. 57-1, at 26–27, 34, 206–07. It is also abundantly clear that Keller arrived at this belief in large part because of what Stephanie Webster told him prior to his resignation.[10] *Id.* Furthermore, when Keller called Webster after finding out about the contents of his FDLE record in November 2014, Webster told him that she and Chief DeLeo "had the understanding that [the

---

no sense: Keller admits that he did not actually complete the training program, and therefore that he did not complete Phase 4. ECF No. 57-1, at 31. The claim that his scores for Phases 3 and 4 were artificially low suffers from the same problem as his claim that Lewis and Begault made false statements about him that harmed him in the eyes of DeLeo: even if true, it simply doesn't alter the fact that it is impossible to conclude that DeLeo *knew* he would have been unjustified in firing Keller.

10. In fact, Keller was not told by anyone besides Webster—including anyone at TPD—that resigning would prevent his departure from being noted as "failure to successfully complete the field training program." ECF No. 57-1, at 207. Keller appears to have arrived at this belief based on what Webster told him and his understanding of "common practice" in police departments. *Id.*

departure] would be voluntary." ECF No. 51-1, at 7. All of this allows the reasonable inference that Webster talked to Chief De-Leo on May 8 before talking to Keller, and that DeLeo told her that Keller could resign and it would be deemed voluntary. Since Webster was acting as Keller's agent,[11] and since Keller's departure was not, of course, noted as being voluntary, a jury could infer that a misrepresentation was made to Keller which he relied on in deciding to resign. But as discussed *supra* Part I.B.1 with respect to Keller's duress theories, the relevant statements from Webster to Keller are hearsay,[12] and this Court cannot consider them for summary judgment purposes.[13] The express misrepresentation theory therefore fails.

The implied misrepresentation theory fails as well. Although Outlaw certainly presented Keller with a clear choice of termination or resignation—and in so doing arguably implied that resignation would not lead to Keller's departure being noted as due to a failure to satisfactorily complete training—Keller correctly understood that Outlaw lacked the power to present him with such a choice, and that he had a third option. As discussed above, the evidence in the record reducible to admissible form does not permit the inference that the choice between resignation and termination was ever again presented to Keller or Webster. In fact, the evidence in the record suggests that such a choice was not on the table at the time Keller resigned. DeLeo, for his part, insists that he never asked Keller to resign. ECF No. 51-12, at 12–13, 5 ¶¶ 20–21. Absent evi-

dence of a stark "resign or be terminated" choice being presented to Keller or Webster by DeLeo, there is no evidence from which a reasonable jury could find that Keller relied on an implied misrepresentation from DeLeo in choosing to resign.

There is no doubt that Keller's belief that resignation would prevent his departure from being later marked as a termination was an eminently reasonable one. But in order for his resignation to be deemed involuntary under a misrepresentation theory, he needs to establish that his belief was formed based on what he was told by the City or individuals acting on its behalf. There is evidence that Keller's belief was based on what Webster told him, but there is no evidence in the record reducible to admissible form that Webster was relaying information provided to her by DeLeo. Without such evidence, a jury could not reasonably find that Keller's resignation was involuntary under a misrepresentation theory.

### 3. Actual Termination

■ Assuming the "actual termination" theory is applicable to this case, it doesn't benefit Keller. DeLeo never communicated a clear intent to fire Keller. As discussed *supra*, the evidence in the record that can be considered doesn't even allow the inference that DeLeo communicated a clear "resign or be terminated" ultimatum to Keller, much less a clear intent to terminate him. On the contrary, DeLeo maintains that he never informed Keller that he intended to fire him. ECF No. 51-12, at 5 ¶ 21. Keller himself even admits that he

---

11. Although the record reveals that Webster may have been initially reluctant to act on behalf of Keller, *see* ECF No. 57-1, at 213, she eventually came to do so. If DeLeo made a misrepresentation to Webster, then that misrepresentation was made to Keller as well.

12. The one statement not discussed earlier—Webster's statement to Keller that she and

Chief DeLeo "had the understanding that [Keller's departure] would be voluntary"—is rank hearsay not within any exception.

13. Perhaps for this reason, Keller's counsel indicated during a telephonic hearing on November 12, 2015 that this particular theory was not being pressed. ECF No. 67.

"did not know" whether he would be terminated if he didn't resign. ECF No. 57-1, at 29.

But Keller's theory centers on Lieutenant Outlaw, not Chief DeLeo. Keller argues that Outlaw's actions on April 25, 2014—telling Keller that he would resign; taking Keller's equipment; telling Keller that there was "no one else [Keller] could talk to"—demonstrate that Defendants had formed the intent to terminate Keller as of that date and communicated that intent to him. ECF No. 60, at 6–7. All this shows, however, is that *Outlaw* had formed the intent to *recommend* Keller's termination, not that the City or DeLeo had formed the intent to actually terminate Keller. In fact, Keller admits that he knew Outlaw lacked the power to terminate him, and his refusal to be cowed by Outlaw's attempted coercion backs this up. *See* ECF No. 57-1, at 193, 200–01.

 Though Keller doesn't label it as such, this theory of the case is really a "cat's-paw" theory. Under a cat's-paw theory, an employer can be liable if a supervisor (such as Outlaw or even Lewis) who is motivated by a desire to retaliate against an employee for protected speech takes action (such as recommending termination or giving artificially low training scores) with the intent that such action will lead to an adverse employment decision, and that action proximately causes an adverse employment decision. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419–22, 131 S.Ct. 1186, 179 L.Ed.2d 144 (2011); *see also Polion v. City of Greensboro*, 614 Fed.Appx. 396, 399 (11th Cir.2015) (employing *Staub's* cat's-paw analysis in a First Amendment retaliation case). An independent review by the decisionmaker (DeLeo) does not relieve the employer of liability unless the review breaks the chain of proximate cau-

sation. *Staub*, 562 U.S. at 420–21, 131 S.Ct. 1186.

The facts in the record fit in nicely with this theory. It wouldn't have been unreasonable for Outlaw to expect that his recommendation would be determinative—DeLeo was relatively new to the job and, according to Keller, said that he didn't even understand the DOR system. ECF No. 57-1, at 206. DeLeo conducted an investigation, but perhaps it was inevitable that he would follow Outlaw's recommendation: though DeLeo steadfastly maintains that he had made no decision at the time Keller resigned, even he admits that all of the officers in the chain of command "concurred ... with option number one"— that is, the offer of resignation in lieu of termination. ECF No. 57-2, at 14–15. Keller perhaps knew from the beginning that Outlaw's recommendation was likely to be determinative, but he nonetheless decided to try to influence DeLeo's decision. When it became clear to him that he would be unsuccessful, he resigned rather than face termination.

How this theory intersects with the concept of "actual termination" is not immediately clear. The actual termination inquiry asks whether the employer has engaged in conduct that "would logically lead a prudent person to believe his tenure ha[d] been terminated." *N.L.R.B. v. Trumbull Asphalt Co.*, 327 F.2d 841, 843 (8th Cir. 1964) (quoting *Putnam v. Lower*, 236 F.2d 561, 566 (9th Cir.1956)). In the context of a cat's-paw case, it seems reasonable that the relevant conduct is that of not only the decisionmaker, but also the supervisor seeking to influence the decisionmaker. The question then becomes whether, at the time of Keller's resignation, the actions of DeLeo and Outlaw[14] —together with Kel-

---

**14.** And Lewis, though the causal connection between Lewis's actions and DeLeo's termi- nation decision is quite attenuated.

ler's reasonable perceptions about Outlaw's intent and ability to influence DeLeo—would have led a prudent person in Keller's position to conclude his termination was a done deal. The answer is no. Again, the evidence in the record that can be considered doesn't allow the inference that DeLeo ever evinced a clear intent to terminate Keller. And DeLeo's actions—meeting twice with Keller, calling Dr. Enfinger, taking his time to make a decision—would have assuaged, not exacerbated, Keller's fear that DeLeo was simply going to rely on Outlaw's allegedly biased recommendation. The admissible evidence in the record would not permit a jury to conclude that it would have been reasonable for Keller to perceive a "clear intent" to terminate him at the time he resigned.[15]

Because Keller's resignation was voluntary, he lacks the necessary "plus" to accompany the alleged "stigma" for his stigma-plus procedural due process claims. Defendants are thus entitled to summary judgment on Counts IV and V of the Second Amended Complaint.[16]

## II. FIRST AMENDMENT CLAIMS

Keller also brings claims against both the City (Count II of the Second Amended Complaint) and the individual defendants (Count III) for unlawful retaliation in violation of the First Amendment. Keller claims that Defendants retaliated against him for the critiques he wrote about Lewis and Begault and the concerns he expressed about Lewis's conduct towards citizens. ECF No. 60, at 3–5, 8. Defendants argue that they are entitled to summary judgment on Keller's First Amendment claims for a number of reasons: Keller voluntarily resigned,[17] ECF No. 54, at 20;

---

**15.** Once again, Keller's claim that Webster told him on May 8 that Chief DeLeo would accept his resignation by 10:00 a.m. the next day is not being considered because it is rank hearsay. Were this Court to consider it, the reasonableness of Keller's perception that a "clear intent" to terminate him had been evinced would be a much closer question. Indeed, many of the theories discussed *supra* might be successful—at least successful enough to defeat summary judgment—were this evidence admissible. But that does not mean that Keller has lost because of a mere technicality: "the hearsay rule ... rests on the sound principle that the reliability of out-of-court declarations not made under oath and not subject to cross-examination and other checks of the trial process is inherently suspect." *Southmark Props. v. Charles House Corp.*, 742 F.2d 862, 875 (5th Cir.1984).

**16.** In his Second Amended Complaint, Keller's due process claims appear to contain elements of *substantive* due process as well as procedural due process. *See* ECF No. 38. Defendants argue that no such claims are viable, ECF No. 54, at 27–28, while Keller seems to ignore the issue entirely, ECF No. 60, at 11. Defendants are correct: insofar as Keller's substantive due process claims concern the loss of his employment, they are not cogniza-

ble. *See McKinney v. Pate*, 20 F.3d 1550, 1560 (11th Cir.1994) (en banc).

**17.** Although this Court has determined that Keller voluntarily resigned, it addresses the First Amendment retaliation claims for two reasons. First, the decision to remove Keller from the training program and place him on administrative leave may have itself been an "adverse action" for purposes of a retaliation claim. *See Crawford v. Carroll*, 529 F.3d 961, 973–74 (11th Cir.2008) ("adverse action" more broadly defined for Title VII retaliation claims than for Title VII discrimination claims); *Sharp v. City of Palatka*, 529 F.Supp.2d 1354, 1368–70 (M.D.Fla.2007) (applying broader definition of adverse action in First Amendment retaliation case). Because there is no doubt that Keller was involuntarily removed from the training program, he may have suffered an adverse retaliatory action regardless of whether his eventual resignation was voluntary. Second, even if the only action that might qualify as an adverse employment action is Keller's resignation/constructive discharge, this Court's determination that Keller's speech is not protected by the First Amendment provides an alternative basis for granting summary judgment on the retaliation claims.

the speech at issue was not protected under the First Amendment, *id.* at 21–25; the speech did not play a substantial part in motivating any adverse employment action against Keller, *id.* at 25–26; and liability cannot attach under § 1983 because the individual defendants are shielded by qualified immunity and the City provided an opportunity for a meaningful review of Chief DeLeo's decision, *id.* at 33–38. There is no need to address all of these arguments, however, because Defendants are correct that Keller's speech was not protected by the First Amendment.

## A. Applicable Law

"[P]ublic employees do not surrender all their First Amendment rights by reason of their employment. Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a citizen addressing matters of public concern." *Garcetti v. Ceballos*, 547 U.S. 410, 417, 126 S.Ct. 1951, 164 L.Ed.2d 689 (2006). In order for First Amendment protections to attach to a public employee's speech, two conditions must be met. First, the speech or expression must be made in the employee's capacity as a citizen rather than as an employee. *Boyce v. Andrew*, 510 F.3d 1333, 1341–42 (11th Cir.2007) (citing *Kurtz v. Vickrey*, 855 F.2d 723, 727 (11th Cir.1988)). Speech made "pursuant to official responsibilities" is entitled to no protection under the First Amendment. *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951. Second, even if the speech is made in the employee's capacity as a citizen, the speech must be "on a matter of public concern." *Id.* at 418, 126 S.Ct. 1951. If these two conditions are met, a public employee's speech is entitled to First Amendment protections provided "the employee's [F]irst [A]mendment interests [outweigh] 'the interest of the state, as an employer, in promoting the efficiency of the public services it performs through its employees.'" *Bryson v. City of Waycross*, 888 F.2d 1562, 1565 (11th Cir.1989) (quoting *Pickering v. Bd. of Educ.*, 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968)).

The two threshold conditions that need to be met for public employee speech to be protected under the First Amendment—the "speaking as a citizen" condition and the "matter of public concern" condition—are "closely intertwined." *Alves v. Bd. of Regents*, 804 F.3d 1149, 1165 n. 5 (11th Cir.2015). They are nonetheless distinct conditions that must be evaluated separately. *See id.*

Determining whether the "speaking as a citizen" condition has been met requires an inquiry into whether "the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." *Lane v. Franks*, —— U.S. ——, 134 S.Ct. 2369, 2379, 189 L.Ed.2d 312 (2014). If an employee speaks "in furtherance of his . . . responsibilities" as an employee, then the speech is made as an employee, not as a citizen, and is not entitled to First Amendment protections. *See Moss v. City of Pembroke Pines*, 782 F.3d 613, 619–20 (11th Cir.2015). In determining what the employee's responsibilities are, "[t]he proper inquiry is a practical one. Formal job descriptions often bear little resemblance to the duties an employee actually is expected to perform, and the listing of a given task in an employee's written job description is neither necessary nor sufficient to demonstrate that conducting the task is within the scope of the employee's professional duties for First Amendment purposes." *Garcetti*, 547 U.S. at 424–25, 126 S.Ct. 1951.

The "matter of public concern" inquiry requires an examination of the "content, form, and context" of the speech to determine whether the speech "can be fairly considered as relating to any matter

of political, social, or other concern to the community." *Lane*, 134 S.Ct. at 2381 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453, 131 S.Ct. 1207, 179 L.Ed.2d 172 (2011)). Speech on a matter of public concern includes speech concerning "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* However, a government employee cannot "transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way public institutions are run." *Ferrara v. Mills*, 781 F.2d 1508, 1516 (11th Cir.1986). To distinguish speech that is nothing more than a grievance in disguise from true "speech on a matter of public concern," it is appropriate to inquire into "the employee's attempt to make her concerns public along with the employee's motivation in speaking." *Alves*, 804 F.3d at 1162.

## B. Analysis

### 1. The Parties' Arguments

Keller argues that his speech was not made as an employee because "it was not [his] official duty to state his concerns regarding Lewis' mistreatment of citizens or the fact that Lewis and Begault provided false information in official reports." ECF No. 60, at 9. Keller further argues that his speech was on a matter of public concern because police mistreatment of citizens and dishonesty in official police reports are matters of interest to the general public. *Id.*

Defendants characterize Keller's speech quite differently: they argue that most of what Keller discussed in his critiques was his training officers' alleged misbehavior towards him and their alleged lies concerning his performance, and that such speech amounts to a personal grievance in disguise. ECF No. 54, at 22–25. The only speech that Keller engaged in that could plausibly be "on a matter of public concern," according to Defendants, was his verbal criticism of Lewis in January 2014 for Lewis's alleged aggressiveness towards a homeless man. *Id.* at 23–24. Given the context in which that speech was made, Defendants argue, it was not "on a matter of public concern." *Id.*

### 2. The Speech at Issue

As a preliminary matter, it is essential to delineate which speech acts are at issue in this case. Clearly the critiques filled out by Keller about Lewis and Begault are the major speech acts that Keller claims "led to Defendants' quest to rid themselves of" him. *See* ECF No. 60, at 3–4. Keller's critique of Lewis included comments that Lewis "made me fill out the wrong boxes" on certain reports; that Lewis "cussed in front of several suspects on calls, and [that] many times people did not want to talk to [Lewis] on calls"; that Lewis "lied on several DORs in [an] attempt to make it look like [he] taught me something"; and that because Lewis was "[r]eady to retire" and (presumably) therefore unmotivated, he prevented Keller from making a number of investigatory stops of cars. ECF No. 51-14, at 37–38. Keller's critique of Begault was also full of criticisms: Keller claimed that Begault "[l]ied on DORs to make it seem he taught something"; that Begault was "just going through the motions" and that he "[d]id not want to go to the bars and make arrests because it was cold"; and that Begault didn't know that driving with a suspended license was a misdemeanor. *Id.* at 39–40.

Also at issue are Keller's comments to Lewis in January 2014 concerning Lewis's treatment of a homeless man. Following a prolonged interaction with a homeless man during which Lewis was verbally aggressive towards the man, Lewis asked Keller why he "did things the way [he] did and was not more aggressive with the young man." ECF No. 51-1, at 3. Keller respond-

ed that he felt that such treatment was "unnecessary and aggressive." and that he would not treat people that way. *Id.*; ECF No. 51-11, at 31–32. Lewis reacted negatively, becoming hostile towards Keller due to what he perceived as Keller's impudence. ECF No. 51-1, at 3; ECF No. 51-11, at 31–32. Keller, in turn, reiterated his opinion that Lewis had been too aggressive. ECF No. 51-1, at 3. This incident, according to Keller, was the beginning of the troubles that would go on to plague Keller's relationship with Lewis. ECF No. 51-11, at 32.

Keller's discussions with Haddon and a few other officers during Phase 3 of his training also comprise a speech act or set of speech acts that could potentially form the basis for a retaliation claim. On or about March 19, 2014, Keller had a discussion with Haddon in which he "went into [his] spiel" about his problems with Lewis and alleged that Lewis had included false information on DORs. ECF No. 57-1, at 127–35; ECF No. 51-1, at 2–3. Later, on April 3, Keller and Haddon had a long talk in which Keller further discussed some of his concerns with the program. ECF No. 57-1, at 62–64. Keller also shared his view that the DOR system was "ridiculous." *Id.* at 62.

Finally, there are Keller's "rebuttals" of the allegedly false DORs that he filled out at the request of Outlaw.[18] These documents contain descriptions of every "lie" made by Lewis and Begault in Keller's Phase 1 and 2 DORs. ECF No. 51-14, at 42–45. However, Keller only included those incidents he was absolutely sure Lewis and Begault had lied about; he left out others that he was "iffy about." ECF No. 57-1, at 180–81.

### 3. "As a Citizen"

■ A review of the entire record leads to the conclusion that the speech acts described above were performed by Keller as an employee and not as a citizen. All of the speech acts at issue were performed as part of Keller's training program and/or at the behest of police officers higher up the chain of command than Keller,[19] all of the speech acts concerned Keller's employment, and all of the speech acts took place in the work environment. None of these factors by itself is dispositive, but together they strongly suggest that Keller's speech was made as an employee. There are other factors to consider with respect to the individual speech acts: the critiques were made in the context of completing a mandatory part of Keller's training program; the rebuttals were prepared at the direction of a supe-

---

**18.** According to Keller, before requesting that Keller write the rebuttals, Outlaw made an attempt to dissuade him from including the allegations of lying in his critiques, telling him that he needed to "re-evaluate" what he was saying. In refusing to acquiesce, Keller was arguably engaging in a wholly different kind of speech than when he wrote the critiques in the first place. In *Jackler v. Byrne*, 658 F.3d 225 (2d Cir.2011), the Second Circuit held that a police officer's refusal to retract a truthful report and submit a false one in its place "constituted speech activity that was significantly different from the mere filing of his initial [r]eport." 658 F.3d at 241. Even though the report itself was likely not protected speech, the speech act of refusing to

change the report *was* protected. Keller makes no claim that his refusal to change the critiques constitutes protected speech, but even if he did such a claim would fail. Key to the result in *Jackler* was the fact that the higher-ups in the police department "repeatedly attempted to force [the plaintiff] to withdraw the truthful report he had filed and to submit one that was false," *id.*; here, Outlaw made a half-hearted effort to get Keller to change his mind.

**19.** Even the conversation with Lewis following the incident with the homeless man began with Lewis asking Keller why he had been (in Lewis's estimation) insufficiently aggressive.

rior officer; the conversations with Lewis and Haddon, though perhaps not strictly part of Keller's duties, were the type of on-the-job, job-related exchanges that "cannot reasonably be divorced from [job] responsibilities," *Alves*, 804 F.3d at 1165 (quoting *Abdur–Rahman v. Walker*, 567 F.3d 1278, 1283 (11th Cir.2009)). All of this compels the conclusion that Keller's speech was made as an employee and not as a citizen. Indeed, Keller's speech is more closely connected to his duties than that of many plaintiff-employees whose speech has been deemed unprotected. *See, e.g.*, *Alves*, 804 F.3d at 1163–65 (clinical psychologists and staff at university counseling and testing center who wrote memo to university officials detailing supervisor's mismanagement were speaking as employees because "[e]ach complaint in the [memo] was made in furtherance of their ability to fulfill their duties with the goal of correcting [the supervisor's] alleged mismanagement, which interfered with [employees'] ability to perform"); *cf. Ricciuti v. Gyzenis*, 832 F.Supp.2d 147, 155–58 (D.Conn.2011) (probationary police officer who prepared documents detailing problems with police department's scheduling and spending practices was speaking as a citizen because speech was "made on her own initiative and mostly outside of work, because it did not concern her duties as a police officer, because it took a form analogous to that of other citizens in town, and because it was addressed to an interested public").

The fact that Keller's speech mostly consisted of raising concerns about his training officers does not change this result. "[I]mplicit in [the] duty to perform [one's job] ... is the duty to inform ... those that would appear to have the most need to know and best opportunity to investigate and correct ... the barriers to" the performance of that job. *Alves*, 804 F.3d at 1165. Here, Keller's speech concerned people whose alleged misdeeds had, in Keller's

estimation, interfered with his progress in the training program, so his reporting of those misdeeds was implicit in his duty to perform his job. Moreover, such a duty was not just implicit, but actually explicit to the extent that Keller was required to fill out the critiques as part of training and was asked by a superior to prepare the rebuttals. Indeed, Keller stated in his April 29th letter to DeLeo that he "honestly believed that [he] had a duty to disclose the issues" with his training officers. ECF No. 51-12, at 15.

Of course, there is something disturbing about a First Amendment doctrine that allows a government employer to use criticism it solicited from an employee as a basis for termination in part *because* it was solicited (and therefore made pursuant to the employee's duties), but such is the nature of *Garcetti*. The Supreme Court reasoned that "[a] public employer that wishes to encourage its employees to voice concerns privately [has] the option of instituting internal policies and procedures that are receptive to employee criticism. Giving employees an internal forum for their speech will discourage them from concluding that the safest avenue of expression is to state their views in public." *Garcetti*, 547 U.S. at 424, 126 S.Ct. 1951. Unfortunately, the Court said nothing about how to deal with the employer that purports to be "receptive to employee criticism" but which in fact uses that criticism to retaliate against its employees. It appears that such faux receptivity might be permitted under *Garcetti*. *See Trusz v. UBS Realty Investors, LLC*, 319 Conn. 175, 123 A.3d 1212, 1227 n. 17 (2015) ("The [C]ourt [in *Garcetti*] failed to recognize, however, that a public employee who speaks pursuant to such internal policies and procedures still might face the prospect of employer discipline for the speech, unless the policies and procedures rose to the level of a con-

tractual guarantee that there would be no retaliation for critical speech.").

### 4. "On a Matter of Public Concern"

■ Even if Keller had been speaking as a citizen when he wrote the critiques, criticized Lewis, etc., his speech would still not be entitled to First Amendment protections. It is clear from the record as a whole that Keller's speech was motivated primarily by a desire to improve his own chances of advancing in the TPD training program and air his gripes with training officers he didn't like, not by a desire to expose police wrongdoing. While this is not by itself determinative, when combined with other facts—the narrow focus of Keller's speech on the misdeeds of his training officers that led to lower training scores for him, the tone of the rebuttals, the fact that Keller never shared his concerns with anyone outside TPD and his circle of intimates—they suggest that Keller is attempting to "transform a personal grievance into a matter of public concern by invoking a supposed popular interest in the way" TPD is run. As such, his speech was not on a matter of public concern.

Keller did not get along with Lewis or Begault. This shines through in the critiques. In his critique of Lewis, for instance, Keller states that they did not have "a healthy relationship"; that Lewis "acted as if I was not a knowledgeable human being"; that Lewis was "not interested in teaching"; and that Lewis's "attitude was horrible." ECF No. 51-14, at 37–38. Even his charge that Lewis had lied on DORs— "[h]e lied on several DORs in [an] attempt to make it look like [he] taught me something," *id.* at 38—is encased in language suggesting that Keller's chief concern was not that Lewis had lied, but that his doing so might have made him look better and Keller look worse. The critique of Begault is similar in tone, *see id.* at 39–40, and also strongly suggests that Keller's main motivation was to air his gripes with a training officer he disliked rather than expose wrongdoing.

■ Of course, the fact that a government employee is motivated by personal interests while engaging in speech does not necessarily render the speech unprotected. *See Alves*, 804 F.3d at 1162. Still, an employee's motives are important to consider, because " 'the relevant inquiry is not whether the public would be *interested* in the topic of the speech at issue,' it is 'whether the *purpose* of [the employee's] speech was to raise issues of public concern.' " *Id.* at 1167 (quoting *Maggio v. Sipple*, 211 F.3d 1346, 1353 (11th Cir. 2000)). Certainly the public might be interested in the fact that certain TPD training officers are sometimes rude to citizens, but Keller only touched upon that topic in his critique "incident to voicing [his] personal concerns," *id.* and thus the "main thrust" of the critiques "took the form of a private employee grievance," *id.* (quoting *Morgan v. Ford*, 6 F.3d 750, 755 (11th Cir.1993)).

The remaining speech acts—the rebuttals, Keller's conversations with Haddon, and Keller's conversation with Lewis about the homeless man—were also not speech on a matter of public concern. While the rebuttals contain descriptions of many incidents of Lewis's and Begault's arguably inappropriate conduct, that conduct is discussed in connection with their alleged lies about Keller's own performance. The Lewis rebuttal, for instance, contains the following:

> "Ofc. Lewis gives me a 2 for Knowledge of Traffic Laws and stated 'We have yet to conduct a traffic stop.' Ofc. Lewis points out that I see a car to pull over in my DOR. After noticing the vehicle, I wanted to perform a traffic stop. Ofc. Lewis stated 'I just got done with court, and it is out of our zone. Lets [sic] not worry about it.' "

ECF No. 51-7, at 1. It is clear that Keller's chief concern here is not that Lewis's laziness is negatively impacting public safety in Tallahassee, but that Lewis's lies to cover up his laziness are negatively impacting Keller's own performance in the training program.

The conversations with Haddon certainly touched on matters that might interest the public, but like the critiques, those conversations were not "directed to such concerns." *See Alves*, 804 F.3d at 1167. Rather, Keller's conversations with Haddon were primarily about Keller's performance in the training program and how that performance was affected by the perceived shortcomings, misrepresentations, and nonfeasance of his training officers.

The speech act that comes the closest to being on a matter of public concern is Keller's conversation with Lewis about the incident with the homeless man. The tone of the conversation as reported by Keller seems to suggest that he was genuinely upset with Lewis's handling of the situation, and that his responses to Lewis were not motivated by any private interest. However, the conversation—which took place between a training officer and his trainee in a work context—was as much an opportunity for discussing proper police techniques as it was an occasion to voice an opinion about how the police should interact with the public. Furthermore, the conversation concerned a single incident during which Lewis had been (in Keller's estimation) overly verbally aggressive— not, for instance, an incident of police brutality. *Cf. Nagle v. Marron*, 663 F.3d 100, 107–08 (2d Cir.2011) (speech about single incident of forgery not on a matter of public concern because there was no claim "that the forgery revealed an ongoing pattern of conduct or even a particularly important instance of bad judgment").

The form and context of the speech acts bolsters the conclusion that they were not on matters of public concern. The critiques were written as part of Keller's training program and were intended to be viewed only by certain members of TPD; the rebuttals were intended for Outlaw (and eventually Chief DeLeo); the conversations with Haddon took place in the work environment. Keller did not attempt to make his concerns public, or even share his concerns with anyone outside TPD or his circle of intimates. Although the non-public nature of Keller's speech is not dispositive, speech made through "internal channels" is less likely to be on a matter of public concern. *See Alves*, 804 F.3d at 1167–68.

The relevant speech acts in this case were made by Keller as an employee, and were not made on matters of public concern. As such, his speech is unprotected under the First Amendment, and Defendants are entitled to summary judgment on Counts II and III of the Second Amended Complaint.

## CONCLUSION

Defendants are entitled to summary judgment on Keller's First Amendment retaliation and procedural due process claims. Keller was not speaking as a citizen on a matter of public concern when he expressed his misgivings and gripes about his training officers and the TPD training program, and his speech is thus not entitled to First Amendment protections. And while Keller seems to have reasonably thought that his resignation would prevent TPD from telling other departments that he had left after failing to satisfactorily complete the training program, there is not enough evidence in the record reducible to admissible form to conclude that he arrived at that belief based on any coercive behavior or misrepresentations on the part of Defendants, or because he reasonably thought that the department had evinced a clear intent to terminate him.

For these reasons,

**IT IS ORDERED:**

1. Defendants' Corrected Motion for Summary Judgment, ECF No. 54, is **GRANTED IN PART**. Defendants are entitled to summary judgment as to Counts II, III, IV, and V of the Second Amended Complaint.

2. This Court declines to exercise supplemental jurisdiction over the remaining claim brought under Florida state law. Count I of the Second Amended Complaint is accordingly **DISMISSED WITHOUT PREJUDICE.**

3. The Clerk is directed to enter judgment in favor of Defendants stating: "All federal claims against Defendants are dismissed with prejudice. The remaining state-law claim against Defendant City of Tallahassee is dismissed without prejudice."

4. The Clerk shall close the file.

**SO ORDERED on November 23, 2015.**